EXXON CORPORATION,
Plaintiff-Appellant,

v.

EXXENE CORPORATION,
Defendant-Appellee.

Nos. 81–2997, 82–1704.

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 28, 1982.
Decided Dec. 30, 1982.
Rehearing Denied Jan. 26, 1983.

Robert Stern, Mayer, Brown & Platt, Chicago, Ill., for plaintiff-appellant.

Thomas R. Juettner, Gary, Juettner & Pyle, Chicago, Ill., for defendant-appellee.

Before BAUER and POSNER, Circuit Judges, and SWYGERT, Senior Circuit Judge.

POSNER, Circuit Judge.

This case began in 1976 when the appellant, Exxon Corporation, filed a three-count complaint against the appellee, Exxene Corporation. Count I charged that Exxene had deprived Exxon of its exclusive right to use the trademark "EXXON," thereby violating sections 33(a) and 35 of the Lanham Act, 15 U.S.C. §§ 1115(a), 1117. Count II charged that Exxene had also violated section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), which forbids the use of "a false designation of origin, or any false description or representation . . . ." Count III charged Exxene with having violated Ill.Rev.Stat. 1981, ch. 140, § 15, which forbids "subsequent use by another of the same or any similar mark, [or] trade name, . . . if there exists a likelihood of . . . dilution of the distinctive quality of the mark, [or] trade name, . . . notwithstanding the absence of competition between the parties or of confusion as to the source of goods or services . . . ." Thus, Counts I and II charged trademark infringement and unfair competition in violation of federal law, and Count III, a pendent count, charged dilution in violation of state law.

Exxene counterclaimed under section 38 of the Lanham Act, 15 U.S.C. § 1120, which forbids the fraudulent procurement of trademark registration. Although Exxon in its complaint had asked only for injunctive relief, the entire case was tried to a jury at Exxene's behest, because the counterclaim sought damages and the issues raised by the complaint and counterclaim overlapped. The jury returned a verdict for Exxene on both the complaint and the counterclaim, and awarded $250,000 in damages. Exxon appeals from both judgments, arguing that it is entitled (1) to a new trial on its trademark infringement and unfair competition claims (Counts I and II of the complaint), because the jury may have been confused by certain allegedly erroneous instructions relating to Exxene's counterclaim and because Exxene was permitted to conduct cross-examination and present evidence in violation of the pretrial order; (2) to judgment notwithstanding the verdict on both its dilution claim (Count III) and Exxene's counterclaim.

Twenty years ago Standard Oil Company (New Jersey) began to cast about for a new trade name. The history of this search (told in Oathout, Trademarks 136–37 (1981)) really begins, though, with the breakup of John D. Rockefeller's Standard Oil empire following the Supreme Court's affirmance in 1911 of the antitrust judgment dissolving Rockefeller's holding company, the Standard Oil Company of New Jersey. See *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 55 L.Ed. 834 (1911). Standard had owned, among its other properties, a number of oil companies organized along regional lines—Standard Oil of California, Standard Oil of New York (now Mobil), Standard Oil of Ohio, and others—and after the breakup the New Jersey company was just another regional company. The decree gave each regional company a monopoly within its territory of the Standard trademarks. The companies were free to compete in each other's territories but only under other trademarks. Standard Oil Company (New Jersey) had the exclusive use of the trademark "Esso," a Standard trademark, in its territory; it could use the trademark overseas, since the territories of the successor companies were domestic; but it could not use the trademark in the territories of the other successor companies—there it had to use other trademarks, "Enco" and "Humble." The situation was unsatisfactory; the company wanted to have a single trademark that it could use everywhere. After a long search it hit on the made-up word "Exxon," and in 1967 it began applying for trademark registrations for the word in connection with various products. In 1972 the company changed its name to Exxon Corporation and began advertising and promoting the

new corporate name and the Exxon trademarks.

Although its best known consumer products are gasoline and motor oil, Exxon makes and sells a wide variety of other products. At the time of trial it owned 71 trademark registrations either for the simple word "EXXON" or for an emblem in which the word appears in red with crossed x's against a blue and white background. These registrations covered a wide variety of products manufactured by Exxon, not just gasoline and motor oil but asphalt, plastic laminated sheets, fertilizer, insecticide, and many others—even hosiery and yarn.

Exxene, a small family business incorporated in 1974, manufactures coatings and precoated plastic sheets. The coatings are applied to motorcycle and snowmobile windshields, ski goggles, other goggles, and scuba diving masks to make them scratch resistant and to prevent fogging. The precoated plastic sheets are the windshields, etc., already coated with Exxene's anti-fogging and scratch-resistant coatings. Most of Exxene's customers are other business firms. They either incorporate Exxene's coatings and sheets into their own finished products or resell the coatings and sheets to the consumer under the firms' own trade names. Only a small fraction of Exxene's output is sold to the consumer under Exxene's trade names and they are unlike its corporate name; the closest is "Xene." However, the corporate name and address usually appear somewhere on the package.

The double x appears in other trade names and trademarks besides those of the parties. "XX," "EXXELLO," and "OXXFORD" are all registered trademarks not owned by either Exxon or Exxene. And the parties do not make any of the same products. Exxon does not make optical coatings or precoated plastic sheets. Exxene does not make any products that Exxon does. The closest connection between the two businesses is that a motorcyclist, snowmobilist, or motorcycle or snowmobile dealer might purchase gasoline or oil from Exxon and windshield coatings from Exxene.

Exxon alleged in its complaint that it owned 66 federal registrations for the trademark "EXXON," and the pretrial order listed as one of the contested issues of fact and law the validity of "any of plaintiff's federal registrations." But Exxon listed only eight registrations as proposed trial exhibits, and Exxene listed no Exxon registrations among its proposed trial exhibits. During the presentation of Exxon's case in chief its counsel asked several witnesses to describe the areas of Exxon's business they were familiar with. In response the witnesses listed a variety of products, many not covered by any of the eight trademark registrations on which Exxon was relying to prove its case. On cross-examination Exxene's counsel asked these witnesses about the trademark registrations covering the products they had named. He was trying to show that Exxon had abandoned them. In addition, he placed in evidence 13 trademark registrations for the word "EXXON"—for such products as laminated plastic sheets, printers' ink, and hosiery— which he contended had been abandoned.

The validity of three of the eight registrations on which Exxon relied was not challenged, but in its special verdict the jury found that each of the five others, and all 13 that Exxene had placed in evidence, had been abandoned, including the use of "EXXON" in connection with motor oil. Although the last finding probably is wrong, it is not quite so fantastic as it seems. The trademark under which most of Exxon's service-station products are sold is the familiar red, white, and blue emblem with the x's in "Exxon" crossed. That trademark is not in issue. Exxon does not rely on it because Exxene has never crossed its x's or otherwise imitated the Exxon emblem; Exxene does not contend that any of the emblem trademark registrations have been abandoned. The trademark in issue in this case is the word "EXXON" in simple capital letters; it is registrations of this trademark that Exxene contends have been abandoned.

Exxon argues that the cross-examination and evidence concerning the 13

trademark registrations not listed in the pretrial order violated that order, were irrelevant and prejudicial, and caught Exxon by surprise. But there was no violation of the actual terms of the pretrial order, and in any event the violation of a pretrial order would not warrant an appellate court's ordering a new trial unless the violation so surprised the party complaining of it that it denied that party a fair hearing. It did not here. Exxon had time to prepare an effective rebuttal dealing with the validity of its own trademarks, a matter on which it is well informed.

So the only question is whether the 13 registrations were relevant; and considering the scope of the direct examination, we think probably they were. It is hard to imagine why Exxon's counsel would have been interested in extracting from its witnesses a description of the great variety of products made by Exxon except to counter the fact, which weakened Exxon's claims under Counts I and II, that Exxon and Exxene do not compete in the marketplace. If firms do not compete directly, it is harder to show that consumers are likely to be confused by similar terms; and confusion is relevant to both trademark infringement and unfair competition. It was in Exxon's interest therefore to impress on the jury the breadth of its product line, so that the jury would think the entire line—a line so long that it seemingly must intersect Exxene's product line somewhere—covered by valid trademark registrations. Whether this was counsel's purpose in his direct examination it was the likely consequence, and naturally it made Exxene want to show that many of Exxon's trademark registrations were invalid because they had been abandoned. We cannot say that the district judge abused his discretion in the management of the trial by allowing Exxene to cross-examine, and put in evidence, on these registrations.

Exxon's other complaint about the judgment on Counts I and II is that the jury, in deliberating on those counts, was confused by allegedly erroneous instructions on the law of trademark abandonment that were given to guide its deliberations on the counterclaim. Even if, as we may assume without deciding, the instructions were erroneous, Exxon is not entitled to a new trial on Counts I and II. The jury rendered a special verdict. It found that Exxon had abandoned 18 of its "EXXON" trademarks, but it also found that Exxene had not infringed the three trademarks the validity of which was not questioned and which as Exxon itself argues covered the products closest to Exxene's. No reasonable jury, having so found, could have gone on to find infringement of other Exxon trademarks, covering products more remote from Exxene's, even if it had believed the other trademarks to be valid. And so with Count II: Exxon's best case of unfair competition lay with the three products the validity of whose trademark registrations was unchallenged, and if the jury was not impressed by the similarity of these products to Exxene's it would not have found confusion with more remote products. True, the psychological effect of a longer product line must not be ignored—it may be, as we have suggested, the reason why Exxon's counsel put in evidence on the length of Exxon's product line. But against this must be set the fact that a charge of unfair competition does not depend on the existence of a valid trademark; section 43(a) of the Lanham Act forbids the use of false designations of origin or other false representations without regard to whether the misrepresentations involve a trademarked product.

Even if the instructions on abandonment did contaminate the jury's deliberations on Counts I and II of the complaint, there is a serious obstacle to Exxon's challenging those instructions on appeal: it did not object to them at the trial. The instructions emerged from a drafting conference between opposing counsel and were presented to the judge as agreeable to both parties. Rule 51 of the Federal Rules of Civil Procedure provides that a party may not complain about an alleged error in instructions unless he objected before the jury retired to consider its verdict.

Although there is no counterpart in the civil rules to Rule 52(b) of the Federal Rules of Criminal Procedure, which allows the court to correct "plain errors" on its own initiative, the courts of appeals, other than the Ninth Circuit, see, e.g., *Bock v. United States,* 375 F.2d 479, 480 (9th Cir.1967), have claimed the power to order a new trial for an error in instructions that was not raised in timely fashion. But if we have "discretion to disregard Rule 51," it " 'should be exercised *sparingly* and only in *exceptional* cases.' " *Platis v. Stockwell,* 630 F.2d 1202, 1206 (7th Cir.1980), quoting (with emphasis added) *McNamara v. Dionne,* 298 F.2d 352, 355 (2d Cir.1962). See also *Shearson Hayden Stone, Inc. v. Leach,* 583 F.2d 367, 370 (7th Cir.1978); *Ellis v. City of Chicago,* 667 F.2d 606, 610 (7th Cir.1981). Exxon cites only one case where this circuit has reversed a judgment in a civil case because of plain error in an instruction to which no objection had been made, *Celanese Corp. of America v. Vandalia Warehouse Corp.,* 424 F.2d 1176 (7th Cir.1970), and we find Exxon's characterization of the case wide of the mark. The court stated in *Celanese:* "The law of the burden of proof is the heart of a case of this nature and must be explained to the jury in order to afford a fair trial. Even though defendant's instructions on the question of the burden of proof tendered under Rule 51 . . . may not have been proper, nevertheless, here it became the trial court's duty to frame such an instruction." *Id.* at 1181. Although Rule 51 thus was mentioned, and although a civil "plain error" case was cited, *Celanese* itself was not a "plain error" case. Counsel had not failed to object to an instruction; he had failed to submit a proper one; and where neither party submits a correct instruction the trial judge's duty of trial management is not discharged simply by adopting the one that is nearer to the mark. Moreover, the submission of even an erroneous instruction could be treated as an objection to the other side's contrary instruction. Here there was acquiescence in the instructions given.

If a lawyer in a civil case who has agreed to instructions may ever get a federal appellate court to order a new trial because the instructions were erroneous, it would have to be in an exceptional case. None has yet arisen in this circuit, and this is not one. Exxon, the party asking for extraordinary relief from the consequences of its lawyers' mistakes, is a huge company whose resources for litigation are for all practical purposes unlimited; as a trivial illustration, its team of appellate lawyers in this case was so large that it could not fit around the counsel table in our courtroom. Exxon brought this suit to force a corporate mouse to abandon its name. The mouse is not even a competitor. Its name is similar to Exxon's but by no means identical and is not even used as a trade name. Having looked at the exhibits we think the jury could reasonably find that the Exxene Corporation of Addison, Illinois was not trying to make people think it was Exxon and that the likelihood of anyone's thinking this was remote. Having sued and lost, Exxon now wants to put Exxene through the hoops a second time, because of an error that Exxon failed to bring to the attention of the trial judge before the jury was instructed. Had it done so the judge might have corrected the error and obviated the necessity (as Exxon sees it) for a new trial. There is no evidence that Exxon was trying to wear out Exxene; but we are not moved to rescue Exxon from its lawyers' mistakes so that it can take another whack at its tiny foe.

With respect to Count III Exxon argues that it was entitled to judgment notwithstanding the verdict because the name "Exxene" must, as a matter of law, be found to dilute the trademark "EXXON." The legal concept of "dilution" under Illinois law is illustrated by *Polaroid Corp. v. Polaraid, Inc.,* 319 F.2d 830 (7th Cir.1963), and more recently by *Instrumentalist Co. v. Marine Corps League,* 694 F.2d 145, 153 (7th Cir.1982). In the earlier case, a firm in the refrigerator business had adopted a name, "Polaraid," that although aptly descriptive of its business was likely to be mistaken for the name of the camera manufacturer. This court held that Polaraid had violated the anti-dilution statute, which "lays a

heavy hand upon one who adopts the tradename or mark of another." 319 F.2d at 836. Although there was no competition between the firms and little if any likelihood that a customer of Polaraid would think that Polaroid had gone into the refrigeration business, the distinctiveness of the name "Polaroid," and the favorable associations that had accrued to it by virtue of Polaroid's commercial success, were undermined by the use of a similar name in connection with other products. No longer would the word "Polaroid" call immediately to mind the highly regarded cameras made by the Polaroid Corporation. The mental image would be blurred, at least to anyone who had dealt with Polaraid or seen its ads, by recollection of Polaraid's refrigeration services. It is the same kind of dissonance that would be produced by selling cat food under the name "Romanoff," or baby carriages under the name "Aston Martin." This is Exxon's concern about the use of the name "Exxene."

■ But a threshold question, ordinarily one of fact, is whether two names are so similar that the distinctiveness of one—its singularity as an identifier of the product of a particular manufacturer—will be impaired by the other. It was within the jury's province to find that "Exxon" and "Exxene" neither look nor sound the same. "Polaroid" and "Polaraid" look almost identical and sound alike. Exxon did put into evidence a survey in which almost half of the people who responded found an "association" between the two names, but Exxene made vigorous efforts to discredit the survey in the jury's eyes and we cannot say that no reasonable jury could have rejected the survey results.

We turn now to Exxene's counterclaim. Section 38 of the Lanham Act is captioned "Civil liability for false or fraudulent registration," and forbids the procuring of a trademark registration "by a false or fraudulent declaration or representation ... or by any false means ...." The special verdict form allowed the jury to find a violation of section 38 on the basis of "conduct of Exxon Corporation in attempting to en-

force trademark registrations which were obtained by false representations or by any false means *or which have not been used, or which have been abandoned.*" The addition of the words that we have italicized has no basis in the statute but was not objected to; as we have already discussed, Exxon acquiesced in the instructions.

■ Exxon's counsel also failed to move for a directed verdict, even though the only evidence of damages was an estimate by Exxene's president that the defense of Exxon's lawsuit had cost his company $250,000 in legal fees. The jury awarded that amount in damages. Unless attorney's fees may be awarded as damages under section 38, Exxene failed to prove any injury from Exxon's alleged violation; and it is improper to submit to the jury a theory of liability for which no relief is sought.

■ In *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 87 S.Ct. 1404, 18 L.Ed.2d 475 (1967), the Supreme Court held that attorney's fees could not be awarded in a suit under section 35 of the Lanham Act (trademark infringement), because there was no explicit statutory authorization for such an award. There was (and is) none in section 38 either, and this led the Second Circuit to hold in reliance on *Fleischmann* that attorney's fees could not be obtained in suits under that section either. *Blue Bell, Inc. v. Jaymar-Ruby, Inc.,* 497 F.2d 433, 439 (2d Cir.1974). Congress amended section 35 the year after *Blue Bell* was decided to provide that "the court in exceptional cases may award reasonable attorney fees to the prevailing party," but it did not amend section 38. Exxene argues that by amending section 35 Congress overruled *Fleischmann* and *Blue Bell* and that the failure to amend section 38 was an oversight. This is extremely tenuous conjecture but even if true would not help Exxene. Section 35 contemplates that when the case is over the winning party will move the court for an award of attorney's fees upon a showing of exceptional circumstances. If attorney's fees are allowable in a section 38 case despite Congress's silence, presumably the same procedure

would be followed. Exxene, however, did not move for an award of attorney's fees. Instead it asked the jury to award it such fees in the form of damages. Since Exxene did not try to prove any other damages, it is not even clear that it was a "prevailing party" within the meaning of the attorney's fees provision in section 35.

Exxene had no justification for filing a counterclaim if it could not prove any injury. Instead, after winning on Count I of Exxon's complaint, which charged Exxene with violating section 35 of the Lanham Act, Exxene should, if it thought the case "exceptional," have filed a motion with the court for an award of attorney's fees pursuant to the amendment to section 35.

Since Exxon did not move for a directed verdict on the counterclaim, it could not ask for judgment notwithstanding the verdict. See Fed.R.Civ.P. 50(b); *Continental Air Lines, Inc. v. Wagner-Morehouse, Inc.*, 401 F.2d 23, 25–26 (7th Cir. 1968). But it did move for a new trial, as it was entitled to do despite its failure to move for a directed verdict; and we think the denial of that motion was an abuse of the trial judge's discretion. No evidence was presented of fraudulent as distinct from abandoned trademark registrations, or of harm to Exxene from the trademarks that Exxon allegedly had abandoned. Although some of those trademarks were among the eight on which Exxon had relied to prove its claims, the trademarks on the three products that were closest to Exxene's were conceded to be valid, so that Exxon would in all likelihood have sued Exxene even if it had had no other trademarks. Furthermore, the only damages proved by Exxene—its attorney's fees— were not recoverable as damages under the statute on which the counterclaim was based. Finally, the jury must have been confused on the abandonment issue because it found without basis in the evidence that Exxon had abandoned the use of the trademark "EXXON" on motor oil.

So there must be a new trial on the counterclaim, though we are not sure there really is anything to be tried. Counsel for

Exxene said at oral argument that he had filed the counterclaim for tactical reasons rather than in the expectation of being able to prove liability and recover damages; he said the idea was that the best defense is a good offense. Maybe the counterclaim was a ploy to get a jury trial, or an indirect, and legally misconceived, form of a motion (which Exxene can if it wants make on remand) for attorney's fees under section 35 of the Lanham Act. The district court can reconsider the legal sufficiency of the counterclaim on remand but we are no more inclined to invoke "plain error" and order dismissal than we were to give Exxon a new trial on Counts I and II.

The judgment dismissing Exxon's complaint is affirmed. The judgment for Exxene on the counterclaim is vacated, and the case is remanded for a new trial on the counterclaim and other proceedings consistent with this opinion. The parties shall bear their own costs in this court.

So Ordered.