Robert A. BRADY, Plaintiff,

v.

CHEMICAL CONSTRUCTION CORPO-
RATION, Aerojet-General Corporation,
General Tire and Rubber Company,
Kenneth G. Carr-Brown, and Kermit
Gabel, Defendants.

CHEMICAL CONSTRUCTION
CORPORATION,
Plaintiff-Appellee,

v.

Robert A. BRADY, Terco, Inc. d/b/a Bos-
co Services, Terry Boswell, Robert
Gruschin, Floyd Beyersdorff, The Hart-
ford Accident and Indemnity Company,
National Surety Corporation, a member
of The Fireman's Fund Insurance Com-
panies, Defendants,

The Hartford Accident and Indemnity
Company, National Surety Corpora-
tion, a member of The Fireman's Fund
Insurance Companies, Defendants-Ap-
pellants.

CHEMICAL CONSTRUCTION CORPO-
RATION, Third-Party Plaintiff,

v.

The HARTFORD ACCIDENT AND
INDEMNITY COMPANY,
Third-Party Defendant.

No. 1291, Docket 84–7097.

United States Court of Appeals,
Second Circuit.

Argued May 25, 1984.

Decided July 31, 1984.

Robert G. Post, New York City (Robert Wang, Hendler & Murray, New York City, of counsel), for defendants-appellants.

Robert Layton, New York City (Theodore L. Hecht, Layton & Sherman, New York City, of counsel), for plaintiffs-appellees.

Before FEINBERG, Chief Judge, and MESKILL and KEARSE, Circuit Judges.

MESKILL, Circuit Judge:

Two insurance companies, The Hartford Accident and Indemnity Company (Hartford) and the National Surety Corporation (National), appeal from a judgment entered after a jury trial by the United States District Court for the Southern District of New York, Broderick, J.[1] The jury found

---

1. This action was before the district court pursuant to its diversity jurisdiction, 28 U.S.C. § 1332 (1982).

The original plaintiff, Robert A. Brady, was a citizen of New Jersey. The defendants were all citizens of other states. Chemical Construction Corporation was incorporated under the laws of Delaware with its principal place of business in New York. Aerojet-General Corporation (Aerojet), its parent corporation, was incorporated under the laws of California with its principal place of business in that state. General Tire and Rubber Corporation, the parent corporation of Aerojet, was incorporated under the laws of Ohio with its principal place of business in that state. Kenneth Carr-Brown was a citizen of New York. Kermit Gabel was a citizen of Oklahoma.

Additional defendant The Hartford Accident and Indemnity Company was incorporated in Connecticut with its principal place of business in that state. Additional defendant National Surety Corporation was incorporated under the laws of Illinois with its principal place of business in California.

that the insurance companies were liable to Chemical Construction Corporation (Chemico) on fidelity bonds covering employee dishonesty. Judgment was entered in favor of Chemico in the amount of $1,156,365.70, plus interest and costs. The insurance companies also appeal the district court's order denying their motion for judgment notwithstanding the verdict or, in the alternative, for a new trial.

We affirm the judgment and order of the district court. Because we conclude that the appeal is frivolous and was taken for purposes of delay, we impose sanctions against the appellants.

## BACKGROUND

In June 1974, Chemico entered into a $227 million contract with V/O Techmashimport, an agency of the Ministry of Foreign Trade of the Union of Soviet Socialist Republics (Russian contract). Under the contract, Chemico was to design, engineer and secure equipment for the construction of four ammonia plants in the Soviet Union. The Russian contract provided for payment upon shipment of equipment and for substantial liquidated damages for late deliveries. Chemico's traffic manager, Robert A. Brady, was responsible for arranging the packing of equipment and for arranging its delivery to the docks for shipment. He was also responsible for obtaining the necessary documents for packing and for approving the invoices for payment.

During early 1976, Pierpoint Packers performed most of the packing work on the Russian contract. By June 1976, Pierpoint Packers was unable to handle all of the packing work and consequently Chemico began to experience shipping delays. Brady selected Terco, Inc., doing business as Bosco Services (Terco), to do additional packing work in accordance with a price list that Terco had submitted in March 1976. Terco had earlier furnished some packing services on the Russian contract. In August 1976, Chemico informed Brady

that his traffic manager position would terminate upon completion of the Russian contract.

Pierpoint performed its work pursuant to standard Chemico procedures using purchase orders and submitting packing lists along with its invoices. Terco, however, usually received no purchase orders and often did not submit packing lists with its invoices.[2] Consequently, most of Terco's charges on its invoices could not be verified by comparing them with either purchase orders or packing lists. Nonetheless, Brady approved for payment all of the Terco invoices.

During the fall of 1976, Chemico experienced more shipping delays. As the danger of substantial liquidated damages increased, Chemico accelerated all aspects of shipping including packing. The number of undocumented Terco invoices increased. Many of them showed rates inconsistent with the price list submitted in March 1976. Some invoices failed to describe the items packed. Brady continued to approve the Terco invoices and to submit them to the accounting department for payment.

When Brady was supposed to be inspecting another vendor's facilities in Houston, Texas, he also went to Tulsa, Oklahoma, the site of Terco's headquarters. There, he spent the night at the home of Robert Gruschin, a Terco vice president, despite a Chemico policy that employees stay in hotels during inspection trips to vendors' facilities. Later that month, Brady accepted a $500 watch as a Christmas gift from Gruschin. Brady was aware of the value of the watch because Gruschin included the purchase slip with the gift. Brady was also aware of a Chemico policy that prohibited employees from accepting anything but nominal gifts from vendors. During February 1977, Brady again deviated from his approved travel plan to visit Tulsa and spent three more nights at Gruschin's home. Gruschin loaned Brady $250 and asked Brady to be the godfather of his

**2.** Chemico issued two purchase orders to Terco, No. 112 on November 5, 1975 and No. 268 on May 3, 1977.

expected child. Gruschin also offered Brady a job with Terco upon completion of the Russian contract at an annual salary of $25,000, more than the $23,600 annual salary that Brady was then receiving from Chemico.

On March 3, 1977, Chemico's chief executive, Kenneth Carr-Brown received a telephone call from an unidentified Terco employee who alleged that one of Chemico's vendors had bribed a Chemico employee to assist in defrauding Chemico. The caller estimated that Chemico had already lost about $300,000 and could lose as much as $1 million.

At a subsequent meeting, the informant identified himself as Kermit Gabel, Terco's purchasing director, and requested $50,000 for his information. Carr-Brown agreed to pay $5,000 and fifty cents for every dollar recovered as a result of the information up to a maximum of $45,000.

On March 14, 1977, Gabel delivered a document to Chemico stating that Terco gave Brady $25,000 to approve fraudulent invoices.

On March 22, 1977, Carr-Brown confronted Brady with Gabel's allegations. Brady admitted that he had received a watch and a job offer from Gruschin. He took full responsibility for approving the Terco invoices, but maintained that he was innocent of any wrongdoing. Brady agreed to aid in ascertaining the amount of any Terco overbilling and signed authorizations giving Chemico access to his financial records. Brady also agreed not to speak to any Terco employee during the investigation.

Although Chemico provided Brady with office space and all available records, Brady did not cooperate in determining the amount of the overcharges. He failed to submit all of his financial records. In addi-

tion, he violated his agreement not to talk to Terco employees and made eighteen telephone calls to Terco's offices or Gruschin's home between March 24 and August 10, 1977. Chemico suspended Brady with pay on April 22, 1977 and discharged him for cause on May 5, 1977.

After investigating Terco's overbilling, Chemico concluded that of the $2,919,921.39 that Chemico paid to Terco, $1,156,365.70 represented overcharges.[3] On September 8, 1977, Chemico, through its attorneys, hired James Marketti to investigate Brady's activities.

On October 21, 1977, Chemico submitted a proof of loss statement to Hartford and National under the fidelity bonds. The policies covered losses caused by "any fraudulent or dishonest act or acts committed by any of the Employees, acting alone or in collusion with others."[4] Chemico claimed a total loss of $1,156,365.70 because its employee "Brady fraudulently and dishonestly used his position as Chemico's Traffic Manager to assist [Terco] in its scheme to invoice Chemico for goods and materials not received and services not performed, and to fraudulently and dishonestly charge Chemico prices for goods and materials, and services far in excess of the prices agreed to by Chemico." Letter from David Loeffler, Layton and Sherman, Attorneys for Chemico, to Vincent Mastrocola, Superintendent of Bond Claims for National (Oct. 21, 1977), *reprinted in* J.App. at 352. Chemico submitted affidavits and other documents in support of its claim.

Embarking on a cursory investigation, Hartford sent the following letter to Brady on November 4, 1977:

This Company, as Surety on your bond while you were employed as a Traffic Department Manager for Chemical Construction Corporation, has been notified

3. When Chemico learned of the fraud, it stopped payment on Terco invoices. Brady had actually approved Terco invoices totaling $3,620,691.24. Of that total, $1,857,405.55 represented overcharges.

4. Chemico filed a claim for $45,000 with the Hartford under Blanket Crime Policy No. 032416, which covered losses from employee

dishonesty up to $50,000 with a $5,000 deductible. Chemico filed a claim with National for $1,280,705 under Comprehensive Dishonesty Disappearance and Destruction Policy No. HCR 2411060, which covered losses above the $50,000 limit of the Hartford policy, minus the deductible.

by your former employer of an alleged discrepancy in your accounts, which is believed to be not less than $1,156,365.70, as set forth in the enclosed proof of loss.

If the information, as alleged, is true, we demand that you forthwith take care of this claim by sending this Company, at the above address, a cashier's or certified check, payable to its order, for the full sum claimed by your former employer; or, if the information as alleged is not true, that you forthwith notify this Company, in writing, that the claim, as made, is false and that you take immediate action to defend yourself and this Company, as your Surety, from and against the claim made.

In the event you fail to take care of the matter as herein directed within ten (10) days after the date of this letter, this Company, without further notice to you, will take such action to protect its interests as the circumstances warrant.

J.App. at 347. Hartford provided Brady with copies of Chemico's loss statement and the supporting documents.

Hartford and National denied Chemico's claims.

On April 28, 1978, Brady sued Chemico, its parent corporations, Carr-Brown and Gabel for defamation and libel based on the claim papers. Chemico brought a counterclaim against Brady for damages based on his involvement in Terco's scheme to defraud Chemico. Chemico also brought a claim against Hartford and National for coverage of its losses under the fidelity bonds.[5]

Trial was held from November 14 through 28, 1983. At trial, Chemico introduced the testimony of Marketti, who described the results of his investigation. On direct examination, Marketti explained that his 1977 investigation was incomplete because Brady had been uncooperative. He testified that Chemico did not learn until 1981 that Brady had not provided them with all of his cancelled checks from his Bankers Trust account and that Brady had an undisclosed bank account in Pompton Plains, New Jersey. On cross-examination, Marketti was asked if he found any evidence that Brady had received a $25,000 bribe. He answered in the negative but explained that his 1977 investigation was limited to the then available Bankers Trust records, and it wasn't until six years later when he realized that by "December of 1976 Mr. Brady, for all practical purposes, stopped using his Bankers Trust account." Marketti said that he then also realized that his earlier affidavits concluding that there were no significant discrepancies in Brady's financial records, were inaccurate. Despite this explanation, Hartford and National introduced some of Brady's financial records (Hartford-National Exhibits 55, 56 and 57) and two affidavits executed by Marketti, one dated October 21, 1977 and the second dated October 19, 1978, in which Marketti concluded that there were no major discrepancies in Brady's financial records. The court ordered Marketti to

---

**5.** Chemico also filed a complaint against Brady, Terco and three Terco employees, including Gruschin, for damages caused by commercial bribery under state law and the Clayton Act § 2(c), 15 U.S.C. § 13(c) (1982). In its complaint against Hartford and National, Chemico also sought indemnification for potential liability from Brady's defamation suit.

Terco counterclaimed against Chemico for amounts due it under purchase order Nos. 112 and 268. Terco also cross-claimed against Aerojet for the same amount, claiming that Aerojet and Chemico were the same entity.

Hartford and National cross-claimed against Brady and Terco in the event the insurance companies were found liable for any of Chemico's claims against them.

By the time of trial, only the following claims remained to be tried:
  (a) Brady's defamation claim against Gabel;
  (b) Chemico's claims for coverage against Terco and Brady for damages from commercial bribery;
  (c) Chemico's claims for coverage against Hartford and National;
  (d) Terco's counterclaim against Chemico for amounts due it on its purchase orders;
  (e) Terco's claim against Aerojet; and
  (f) Hartford's and National's cross-claim against Brady and Terco in the event the insurance companies were found liable to Chemico.

remain available for recall by the insurance companies, but they did not recall him.

Hartford and National called Brady as a witness. During cross-examination the court allowed Chemico to introduce Hartford's letter to Brady to show Brady's bias in favor of the insurance companies.

The jury, in answer to a specific question, found that Brady had willfully and knowingly approved the fraudulent invoices to aid Terco in defrauding Chemico. Consequently, in its judgment entered on December 21, 1983, the district court ordered Hartford and National to pay Chemico's claim under the fidelity bonds for $1,156,365.70, plus interest and costs.[6]

Hartford and National immediately moved for judgment notwithstanding the verdict and, alternatively, for a new trial. The insurance companies claimed that Marketti's testimony and Hartford's letter to Brady should have been excluded and that the evidence was insufficient to support the jury's verdict that Brady had acted dishonestly in approving the invoices. The district court denied the motion.

## DISCUSSION

Hartford and National claim on appeal that the district court abused its discretion in denying their motion for a new trial. They argue that Marketti's testimony should not have been admitted and that the circumstantial evidence of Brady's intentional participation in Terco's fraudulent scheme was insufficient to support the jury's verdict. They also claim that they did not receive a fair trial because the admission of Hartford's letter to Brady, which they maintain had no probative value, inflamed the jury.

Appellants' claims are totally without merit.

■ A district court's denial of a new trial motion will not be reversed unless the district court abused its discretion. *Caribou Four Corners, Inc. v. Truck Insurance Exchange*, 443 F.2d 796, 799 (10th Cir.1971). No abuse of discretion occurred here in the court's denial of appellants' motion for a new trial.

Hartford and National sought a new trial because they claimed that the admission of Marketti's testimony unfairly surprised them. They assert that (a) Marketti testified as an expert even though he was listed as an ordinary witness in the pretrial order, (b) Chemico failed to update its answers to interrogatories concerning the investigation even though Chemico knew that Marketti would be testifying about events that occurred subsequent to discovery, and (c) there was no factual basis for Marketti's conclusion that Brady had decreased his use of his Bankers Trust account. These assertions are completely groundless.

■ Surprise does not warrant a new trial unless it deprives the party of a fair hearing. *Exxon Corp. v. Exxene Corp.*, 696 F.2d 544, 548 (7th Cir.1983). The record fails to support the insurance companies' claim that they were deprived of a fair hearing. Marketti did not testify as an expert witness. He detailed the facts that he personally had learned during his investigation of Brady and the conclusions he had reached. His conclusions did not require any specialized knowledge and could have been reached by any ordinary person. He thus testified as a lay witness. *Abernathy v. Superior Hardwoods, Inc.*, 704 F.2d 963, 970 (7th Cir.1983) (Fed.R.Evid. 702–703, dealing with expert testimony based on "specialized knowledge," are irrelevant to testimony of lay person not requir-

---

6. The insurance companies were ordered to pay six percent interest from May 26, 1978 to June 15, 1981 and nine percent interest from June 15, 1981 to the date of judgment. Total interest was $473,989.92.

  The following judgments were entered on the other claims:
  (a) Brady's defamation action against Gabel was dismissed;

(b) Chemico could recover damages from Terco for commercial bribery;
(c) Chemico's action for damages against Brady was dismissed by agreement of the parties;
(d) Terco could recover from Chemico for its services under purchase order No. 268; and
(e) Hartford and National could recover from Brady and Terco any amounts paid to Chemico under the judgment.

ing such knowledge); *see Teen-Ed, Inc. v. Kimball International, Inc.*, 620 F.2d 399, 403 (3d Cir.1980) (lay witness may testify to facts within personal knowledge under Fed.R.Evid. 602). Under Fed.R.Evid. 701, a lay witness may testify about his conclusions if they are based upon his perceptions and if they aid the jury in understanding the witness' testimony. *Teen-Ed, Inc.*, 620 F.2d at 403. Because Marketti's opinions were based on his personal observations and were helpful to the jury by providing an overview of Brady's financial status, they were admissible. *See Scheib v. Williams-McWilliams Co., Inc.*, 628 F.2d 509, 511 (5th Cir.1980) ("[T]he ultimate decision on admissibility [of lay opinions] rests in the hands of the trial judge whose exercise of discretion in this regard will not be overturned absent clear abuse."). In addition, Hartford and National could not have been surprised that Marketti testified about his investigation or stated his conclusions. They possessed Marketti's affidavits and could have easily ascertained from them the basic nature of Marketti's testimony.

■ Hartford's and National's claim that they were deprived of a fair hearing because Chemico failed to update its interrogatories to include Marketti's 1983 investigation lacks credence. The insurance companies had ample opportunity at trial to respond to Marketti's testimony. *See Exxon Corp. v. Exxene Corp.*, 696 F.2d 544, 548 (7th Cir.1983) (when party has ample opportunity to rebut "surprise testimony," new trial not required). They cross-examined Marketti about the factual basis for his conclusion that Brady had decreased his use of his Bankers Trust account. Many of the facts that they claim were prejudicial were elicited by them during cross-examination. Even though Marketti remained available for recall, the insurance companies did not recall him. The court allowed Hartford and National to introduce three exhibits not listed on the pretrial order, Hartford-National Exhibits 55, 56 and 57, to rebut Marketti's testimony.

Appellants' claim that they were denied a fair hearing because Marketti's opinions were unsupported by any facts on the record is false. The record is to the contrary. Marketti testified that in December 1976 deposits in Brady's Bankers Trust account dropped from 83 percent of Brady's income to 33 percent and that Brady had an undisclosed second bank account.

■ Appellants also assert that they are entitled to a new trial because the evidence adduced at trial was insufficient to support the jury's verdict. Appellants contend that the only evidence supporting the verdict was circumstantial and concerned Brady's behavior after he had been accused of the fraud.

This contention is unfounded. There was direct evidence establishing that Brady had formed more than a business relationship with Terco and that Brady had a motive for participating in a Terco scheme to defraud Chemico. Brady twice visited the home of Terco vice president Gruschin, accepted a $500 watch from Gruschin and was asked by Gruschin to be the godfather of his child. Brady was aware that his position with Chemico would terminate upon the completion of the Russian contract and Terco offered him a higher salaried position. All of these events occurred before the accusation of fraud.

The evidence of Brady's intentional participation in Terco's fraudulent invoice scheme was overwhelming. More than half of the invoices submitted by Terco and approved by Brady were fraudulent. Pierpoint Packers, unlike Terco, performed packing work pursuant to purchase orders and submitted packing lists with their invoices. After the fraud was discovered, Brady's conduct was also inculpatory. He did not cooperate in determining the amount of overbilling, as he had promised to do. He did not supply all of his financial records. He contacted Terco employees after promising not to do so. Clearly, the court did not abuse its discretion in denying appellants' motion for a new trial on the

ground of insufficient evidence.[7] *See Bevevino v. Saydjari*, 574 F.2d 676, 685 (2d Cir.1978) (standard of appellate review for new trial motions based on sufficiency of evidence is abuse of discretion).

■ Appellants' final ground for its claim for a new trial is equally frivolous. Appellants argue that the district court should have excluded the letter under Fed. R.Evid. 403 because its prejudicial impact outweighed its probative value. We disagree. The letter establishes Brady's reason for siding with Hartford and National. Because Brady was testifying as a witness for the insurance companies, the letter was properly admissible to demonstrate bias. While the letter may have put the insurance companies in a bad light, it was not inflammatory. *See Bohack Corp. v. Iowa Beef Processors, Inc.*, 715 F.2d 703, 709 (2d Cir.1983) ("Because the trial judge 'is in a superior position to evaluate the impact of the evidence, since he sees the witnesses, defendant[s], jurors, and counsel, and their mannerisms and reactions,' we are reluctant to overturn his evidentiary rulings unless he has acted arbitrarily or irrationally." (citations omitted)); *United States v. Robinson*, 560 F.2d 507, 514–15 (2d Cir. 1977) (en banc), *cert. denied*, 435 U.S. 905, 98 S.Ct. 1451, 55 L.Ed.2d 496 (1978); *see also Brink's Inc. v. City of New York*, 717 F.2d 700, 710 (2d Cir.1983) (evidence must be more than "damning" to be excluded under Rule 403, it must be "inflammatory").

■ Because we find absolutely no merit in appellants' claims, we affirm the judgment of the district court and its subsequent order denying the new trial motion. We regard this appeal as frivolous. Appellants' brief, which ignores significant issues and facts while deploying a smokescreen of irrelevant facts and tangential issues, substantiates our belief that the appeal was taken to avoid or at least delay contractual obligations. Consequently, we invoke our sanction powers under 28 U.S.C. § 1912 and Fed.R.App.P. 38.[8]

Chemico may recover as damages three percent interest on its judgment from the date of its entry in addition to the post-judgment interest provided by 28 U.S.C. § 1961 (1982), plus double costs on this appeal and attorney's fees.[9] *See Oscar Gruss & Son v. Lumbermen's Mutual Casualty Co.*, 422 F.2d 1278, 1285 (2d Cir. 1970) (awarding an additional four percent interest on the judgment appealed from, double costs on the appeal and attorney's fees).

---

7. Appellant and appellee in their briefs use different tests in arguing the sufficiency of evidence question. Although "[i]n this circuit it is an open question whether the test [applied by the district court] for sufficiency of evidence in a diversity case is one of federal or state law," *Index Fund, Inc. v. Insurance Company of North America*, 580 F.2d 1158, 1163 (2d Cir.1978), *cert. denied*, 440 U.S. 912, 99 S.Ct. 1226, 59 L.Ed.2d 461 (1979); *but see Bevevino v. Saydjari*, 574 F.2d 676, 685 (2d Cir.1978) (applying federal standard without comment), the evidence here is sufficient to satisfy either standard. *See Index Fund, Inc.*, 580 F.2d at 1163 ("[U]nder federal law, 'to be insufficient to support a verdict, the evidence must all be one way from which only one reasonable inference can be drawn.'... [Under] New York's local law ... a jury verdict should not be set aside unless it is clear from the record that the jury could not have reached its conclusion on any fair interpretation of the evidence." (citations omitted)).

8. 28 U.S.C. § 1912 (1982) states:
   Where a judgment is affirmed by the Supreme Court or a court of appeals, the court in its discretion may adjudge to the prevailing party just damages for his delay, and single or double costs.
   Fed.R.App.P. 38 states:
   If a court of appeals shall determine that an appeal is frivolous, it may award just damages and single or double costs to the appellee.

9. The appellants shall pay attorney's fees in an amount to be agreed upon by the parties, if possible. Otherwise, the amount is to be set upon application to this Court.