**Ivar J. QUEEN, Appellant,**

**v.**

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY.**

**No. 87–7095.**

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 5, 1988.

Decided March 25, 1988.

Patrick M. Regan, with whom Marc Fiedler, Washington, D.C., was on the brief for appellant. William P. Lightfoot, Washington, D.C., also entered an appearance for appellant.

John G. Elligers, with whom Sara L. Lister, Mark R. Pohl and Gerard J. Stief, Washington, D.C., were on the brief for appellee. Richard W. Beebe, Washington, D.C., also entered an appearance for appellee.

Before WALD, Chief Judge, STARR, Circuit Judge, and MacKINNON, Senior Circuit Judge.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

On January 10, 1985, as he was heading home from a morning of shopping, Ivar Queen, a resident of Washington, D.C., was run over by a city transit bus. Both of his legs were fractured. Queen brought suit in federal district court against the Washington Metropolitan Area Transit Authority ("WMATA"), contending that WMATA's bus driver had negligently operated the bus that struck him. The jury, however, returned a general verdict for WMATA. In this appeal, Queen challenges the district court's instructions to the jury, as well as the refusal to exclude a fact witness from the courtroom and the admission of an expert witness' testimony. Although Queen does identify shortcomings in two rulings, we conclude that neither constituted reversible error. We therefore affirm.

## I. BACKGROUND

The accident occurred shortly after noon near a bus stop at the intersection of 34th Street and Benning Road in northeast Washington. Queen was a passenger on one of WMATA's X–4 buses that pulled into the bus stop. Immediately ahead in the right lane adjacent to the bus stop was an X–2 bus. Queen planned to transfer to the X–2 bus to take him home. He disembarked through the rear door of the X–4, and ran until he was alongside the right side of the X–2 bus, which had closed its doors and begun to move out of the bus stop. Queen yelled at the bus driver to stop, and while running along the side of the bus, pounded the side of the bus with his left hand, in an attempt to attract the attention of the driver. Moments later, Queen either fell or was knocked beneath the X–2 bus, and its rear wheels ran over his legs below the knees.[1]

On January 13, 1986, Queen brought suit against WMATA in federal district court, contending that the driver of the X–2 bus, Charleen Jenkins, had operated it in a negligent manner and that her negligence was the proximate cause of the accident. Trial was held in May 1987 and lasted five days.

Queen's theory of WMATA's liability at trial turned on the fact that the X–2 bus that ran over him was an "articulated" coach: a species of bus with a front section (the "tractor"), a rear section (the "trailer"), and a connecting middle bellows (the "fifth wheel") which appears to be about three feet wide and is largely composed of a rubber-impregnated canvas material that folds like the pleated bellows of an accordion. See Plaintiff's Exhibits 3J and 3L. At 55 feet in length, articulated buses are 15 feet longer than WMATA's regular buses. Queen's contention was that because an articulated bus pivots not on its rear wheels, but on its middle ones, the rear wheels tend to swing out in the opposite direction from the one in which the front

---

1. Evidence at trial showed that Queen fell at a spot where the curb was broken by a deep gouge that extended all the way across the curb, and next to the street was a hole whose depth was half the height of the curb. See Plaintiff's Exhibits 3C, 3F, 3H and 4C. Exhibit 3C best shows this.

wheels are steered. In this instance, Queen alleged, as the bus turned left to leave the bus stop, the rear wheels had swung to the right, and the right side of the bus just above the rear wheels had swung over the curb and struck Queen's left shoulder and arm, knocking him to the ground under the bus. Additionally, Queen argued that Jenkins had not properly looked out her right-side window before leaving the bus stop; if she had, she would have spotted Queen and stopped the bus before it ran over him.

WMATA countered that Queen had not been knocked down by the rear of the bus swinging over the curb, a phenomenon it sought to prove could not take place. Rather, WMATA contended that Queen had either been struck by the middle accordion section of the bus coming into contact with his outstretched left arm, or that Queen had slipped and fallen beneath the bus, which was traveling only about 3 miles per hour at the time of the accident. It maintained that Queen was responsible for the accident, since he had been running on the curb alongside the bus with his arm extended into the street, and that Queen, in conversations with Jenkins immediately after the accident and with another driver months later, admitted that he had slipped and fallen and that the accident was his fault. The district judge gave assumption of risk and contributory negligence instructions to the jury.

The jury returned a general verdict for WMATA. In this appeal, Queen challenges (1) the wording of the assumption of risk instruction given by the trial judge; (2) the fact that the judge gave a contributory negligence instruction at all; (3) the judge's refusal to submit a proposed instruction that would limit Queen's contributory neg-

ligence exposure; and (4) the judge's refusal to adopt Queen's proposed last-clear-chance instruction. He also argues two additional causes of reversible error: allowing bus operator Jenkins to be present in the courtroom prior to the giving of her own testimony, and allowing another WMATA employee to testify in what Queen asserts was an expert witness capacity despite the transit authority's failure to identify the employee as an expert witness in pretrial interrogatories.

## II. THE CHALLENGED INSTRUCTIONS

### A. The Assumption of the Risk and Contributory Negligence Instructions

Under District of Columbia law, the doctrine of assumption of risk "operates only when the party *actually knows* the full scope and magnitude of the danger and thereafter voluntarily exposes himself to it." *Stager v. Schneider*, 494 A.2d 1307, 1311 (D.C.1985) (citation omitted; emphasis added). By contrast, the doctrine of contributory negligence operates as a defense "when a party knows or by the exercise of ordinary care *should have known* a particular fact or circumstance." *Id.* (emphasis in original).

The district judge in this case submitted to the jury both an assumption of risk and a contributory negligence instruction. The assumption of risk instruction allowed the jury to find that Queen assumed the risk of injury if it determined, among other things, "that plaintiff knew or should have known of the existence of a dangerous situation."[2] The gravamen of Queen's challenge to this instruction is that it erroneously permitted the jury to find assumption of risk by imputing to him

---

**2.** *See* Appendix ("A") at 659. The entire assumption of risk instruction reads as follows:

Now this other instruction is given. It is called assumption of risk. In this case, the defendant contends that the plaintiff assumed the risk and that this action on the part of the plaintiff caused the injury. You are instructed that if you find that the plaintiff assumed the risk, then he is not entitled to recover. To find assumption of the risk, the evidence must show the following:

One, that plaintiff knew or should have known of the existence of a dangerous situation; and

Two, that plaintiff voluntarily exposed himself to that danger.

The defense of assumption of the risk is not applicable if you find the plaintiff had the duty and the legal right to expose himself to any of the dangers in question.

*Id.*

knowledge of the hazards his behavior entailed, without requiring that the jury find he in fact knew "the full scope and magnitude of the danger." *Stager*, 494 A.2d at 1311.

This critique is clearly correct. The phrase "should have known" is, as *Stager* teaches, a classic element of a contributory negligence instruction, not an assumption of risk one, for it necessarily invites juries to impute knowledge to the plaintiff based not upon his actual or constructive knowledge, but upon that of the ordinary person. District of Columbia law has consistently regarded such departures from the requirement of actual knowledge as patently impermissible.[3] WMATA justifies the assumption of risk instruction on the grounds that it tracks the model Superior Court civil instruction. This, however, is not an adequate reason for departing from D.C. law, and indeed, the District of Columbia Court of Appeals has recently criticized the model instruction formulation as defective, precisely because it invites application of a reasonable man standard, not "the subjective standard of true assumption of risk." *See Sinai v. Polinger Co.*, 498 A.2d 520, 526 & n. 10; *see also id.* at 526 n. 8 ("plaintiff's 'failure to exercise due care either to discover or to understand the danger is not properly a matter of assumption of risk, but of the defense of contributory negligence' ") (quoting Restatement (Second) or Torts § 496D, comment b).

Unhappily for Queen, District of Columbia law also teaches that faulty assumption of risk instructions do not necessarily constitute reversible error. Only nonprejudicial error occurs when, as here, the defective assumption of risk instruction does no more than effectively replicate a legally correct contributory negligence instruction also given to the jury. The District of Columbia Court of Appeals recently dealt with this overlap in *Sinai*, where a tenant sued a landlord for providing inadequate protection against an assault committed by another tenant, and the landlord countered by alleging that the tenant had courted the danger by confronting the assailant rather than awaiting the arrival of the police. As in this case, the trial court in *Sinai* issued an instruction styled as an assumption of risk instruction which, however, charged the plaintiff with knowledge he "knew or should have known." *Id.* at 524. The court found the inclusion of contributory negligence language in the assumption of risk instruction not to be reversible error, stating:

> in light of the focus of the assumption of risk instruction here on the reasonableness of the plaintiff's conduct rather than upon his conscious assent to encounter a known risk, it is unlikely that the jury could have interpreted the instruction as anything more than a repetition of the previously given contributory negligence instruction.

*Id.* at 527.

The same reasoning applies here. We are unable to discern any damage the faulty assumption of risk instruction could have inflicted upon Queen. The contributory negligence instruction given at trial was a standard instruction, inquiring whether Queen failed to act with the prudence of an ordinary reasonable person under the circumstances.[4] *Stager*, 494 A.2d at 1311.

■ We also must reject Queen's challenge to the appropriateness of giving any

---

**3.** *See, e.g., Sinai v. Polinger Co.*, 498 A.2d 520, 524 (D.C.1985) (citing Restatement (Second) of Torts § 496D); *Stager*, 494 A.2d at 1311; *Scoggins v. Jude*, 419 A.2d 999, 1004–05 (D.C.1980); *Morrison v. MacNamara*, 407 A.2d 555, 566–67 (D.C.1979); *Martin v. George Hyman Construction Co.*, 395 A.2d 63, 71–72 (D.C.1978); *see also White v. United States*, 780 F.2d 97, 108 (D.C.Cir. 1986); *Kanelos v. Kettler*, 406 F.2d 951, 955 (D.C.Cir.1968); *Dougherty v. Chas. H. Tompkins Co.*, 240 F.2d 34, 35–36 (D.C.Cir.1957).

**4.** The district judge's contributory negligence instruction, which immediately followed his instructions defining "negligence" and "proximate cause," read as follows:

> Now I want to talk about contributory negligence and give you a definition of that term. A plaintiff cannot recover if his negligence is a proximate cause of his injury. The defendant, that is to say the transit authority, has the burden of proving that plaintiff's negligence was the cause of the plaintiff's injury. A.658–59.

contributory negligence instruction at all. His argument is that "no factual predicate" existed to support the instruction. That contention is wrong. Numerous items of evidence call into question whether Queen exercised ordinary care as he sought to catch up with and board the X–2 bus. Several witnesses, including Queen, stated that he had been running along the curb next to the moving bus, *see* Appendix ("A") at 124–26, 143, 175, 424, 434, 521; that he had banged several times on the bus with his left arm extended into the street, *see* A.126, 154–55, 185, 204–05, 387, 392; and that the bus was moving while he was banging, *see* A.126, 154, 401, 519, 522. There were also assertions, whose validity Queen denies, of bus driver Jenkins and another bus driver that Queen, after the accident, conceded he was at fault. *See* A.308, 365; *see also* A.190–91 (Queen's denial of such admissions). These evidentiary items constitute a legally sufficient basis for giving a contributory negligence instruction.[5] We therefore reject Queen's challenge to the contributory negligence instruction, and conclude that the assumption of risk instruction, though defective, was not reversible error.[6]

B. *The Refusal to Give Queen's Limiting Instruction on Contributory Negligence*

■ Queen also contends that the trial judge erred in refusing an oral request to supplement the contributory negligence instruction with an instruction stating that if the jury found that Queen, prior to being struck, had stopped running and knocking on the side of the bus, they should not consider his prior conduct as contributorily negligent.[7] Queen's argument is that his claim that he had stopped running at the time of impact "negates the possibility that his negligence was a substantial factor in causing his injuries." Brief for Queen at 20.

We do not agree. Queen's proposed instruction would create too sharp a dichotomy between the actions Queen took before ceasing running, which a jury could not consider, and those he took afterward, which it could. The record in this case supports no such clean break. Evidence that Queen continued to extend his arm into the street even after he stopped running, if credited by the jury, could support a finding of contributory negligence. Although Queen is correct that "a party is, upon proper request, entitled to an instruction upon his theory of the case if there is evidence to support it," *Wegerer v. First Commodity Corp of Boston,* 744 F.2d 719, 723 (10th Cir.1984), a judge also need not hew to the "particular language" advocated by a party. *Id.* Here, the trial judge's traditional contributory negligence instruction left room for the jury to apply Queen's theory of the case, without creating the potential for misleading the jury inherent in Queen's orally proposed instruction.

C. *The Refusal to Give a Last Clear Chance Instruction*

■ Queen also argues that the district judge improperly denied him a last clear chance instruction.[8] Under District of Co-

---

**5.** *Calbreath v. Capital Transit Co.,* 240 F.2d 621 (D.C.Cir.1956), a case cited by Queen involving a collision between a bus and a pedestrian, is easily distinguished. In *Calbreath,* this circuit reversed a directed verdict for a defendant that had been based on a trial court judge's conclusion that the plaintiff had stood so close to the curb so as to be contributorily negligent. *Id.* at 622. This case, by contrast, involves no directed verdict, but rather turns on disputed fact issues appropriate for a trial, including the location and behavior of the plaintiff at the time of the incident. Unlike in *Calbreath,* the evidence here also allowed the jury to conclude the plaintiff had part of his body extended beyond the curb onto the street.

**6.** We need not address WMATA's additional argument that Queen's challenges on appeal must fail because he failed to object properly at trial.

**7.** The instruction requested by Queen was that "if the jury finds that Mr. Queen had stopped running and knocking on the bus, prior to being struck by the bus, then they are not to consider his prior conduct as contributorily negligent." A.589.

**8.** *See* A.544–45, 565–76 (Queen's requests for such an instruction); A.546, 579 (the denial of these requests).

lumbia law, a plaintiff seeking such an instruction must submit evidence

(1) that plaintiff was in a position of danger caused by negligence of both plaintiff and defendant; (2) that the plaintiff was oblivious of the danger or unable to extricate himself from the position of danger; (3) that defendant was aware, or by the exercise of reasonable care should have been aware of the plaintiff's danger and obliviousness or inability to extricate himself from the danger; and (4) the defendant with means available to him was by the exercise of reasonable care able to avoid striking plaintiff after he became aware of the latter's danger and inability to extricate himself from danger, and failed to do so.

*Washington Metropolitan Area Transit Authority v. Jones,* 443 A.2d 45, 51 (D.C. 1982) (citing *Mathews v. Lindsay,* 281 F.2d 927, 928 (D.C.1960)); *see also Felton v. Wagner,* 512 A.2d 291, 296 (D.C.1986).

Putting to one side the first, third and fourth requirements of the doctrine, all of which in this case turn on disputed issues of fact, Queen patently falls afoul of the second prong of this test: that he provide evidence of his obliviousness to the danger or his inability to extricate himself from it. As for his obliviousness to his position of danger, Queen, by his own admission in court, was running immediately adjacent to a moving bus and pounding its side while it pulled out of the bus stop. Even after he ceased running, he concedes that he continued to extend his left arm into the street. No evidence suggests that Queen was ignorant of the fact that by virtue of these actions, he had put himself into this dangerous position. Queen counters that he was unaware of the particular possibility (which WMATA denies exists) that the rear of an articulated bus could swing over the sidewalk and strike a pedestrian. However, he has offered no proof denying his full awareness of the broader and temporally coextensive danger, which it takes no expertise to infer, that one who extends his arm over the street next to a moving vehicle may come into injurious contact with the vehicle. As for Queen's ability to extricate himself from his position of danger,

Queen makes no argument, and no evidence of which we are aware suggests that Queen, mobile and standing on an open street, was unable to extricate himself at any point in time by stopping running and by moving his arm fully into the vertical plane of the sidewalk. We therefore find no error in the district judge's refusal to offer a last clear chance instruction.

### III. The Refusal to Exclude Charleen Jenkins

■ Queen also challenges the district judge's refusal to exclude bus driver Jenkins from the courtroom during opening arguments and during testimony preceding her own. This ruling, he contends, exposed her to "critical witness testimony and, more importantly, the trial strategies of both plaintiff's counsel and defendant's counsel." Brief for Queen at 38.

The relevant law governing this contention is provided by Federal Rule of Evidence 615, which provides for the sequestration of a witness when requested by one of the parties, except when the witness is (1) "a party who is a natural person"; (2) "an officer or employee of a party which is not a natural person designated as its representative by its attorney"; or (3) "a person whose presence is shown by a party to be essential to the presentation of its cause." Fed.R.Evid. 615. Sequestration is designed to prevent "the possibility of one witness shaping his testimony to match that given by other witnesses at the trial." *United States v. Leggett,* 326 F.2d 613 (4th Cir.), *cert. denied,* 377 U.S. 955, 84 S.Ct. 1633, 12 L.Ed.2d 499 (1964); *see also United States v. Johnston,* 578 F.2d 1352, 1355 (10th Cir.1978), *cert. denied,* 439 U.S. 931, 99 S.Ct. 321, 58 L.Ed.2d 325 (1978).

We agree with WMATA that Jenkins falls within the plain language of the second exception to Rule 615, that for "designated representatives" of corporate parties. Queen's argument in response is that Rule 615(2) was meant to except only officers and agents of parties empowered to bind the party through their testimony, a reading under which bus driver Jenkins would have to be sequestered. Although this functional interpretation of Rule 615(2) is

hardly implausible, it finds no support in the text of Rule 615 (which speaks not of "agents" or "employees" but rather of "representatives"), nor in the advisory committee notes accompanying that rule (which cite with approval the practice of allowing government counsel to have investigative agents, who also will serve as witnesses, at counsel table at trial). Nor does Queen direct us to any authority on Rule 615 that supports his interpretation. *Government of Virgin Islands v. Edinborough,* 625 F.2d 472 (3d Cir.1980), involved not Rule 615(2), but rather the Rule 615(3) exception for essential persons, and in any event, it noted that even after the adoption of Rule 615, sequestration of witnesses remained a matter within the discretion of a trial judge. *Id.* at 474 (citing case authority). *Trans World Metals, Inc. v. Southwire Co.,* 769 F.2d 902 (2d Cir.1985), also dealt only with Rule 615(3), and like *Government of Virgin Islands,* it found no violation of that rule. Moreover, as WMATA notes, in a number of cases, albeit ones arising in the criminal context, courts have rejected requests under Rule 615(2) to sequester important advisory witnesses despite the fact that these persons could not convincingly be described as agents or employees. *See, e.g., City of Aurora v. Erwin,* 533 F.Supp. 457 (D.Colo.1982), *aff'd,* 706 F.2d 295 (10th Cir.1983). We therefore reject this aspect of Queen's challenge.[9]

## IV. THE EXPERT TESTIMONY OF DONALD FLUHARTY

■ Finally, Queen challenges the testimony of Donald Fluharty, a WMATA supervisor of bus operator training and safety. Fluharty took the stand at WMATA's behest to describe bus driver operating instructions and the workings of an articulated bus. Queen contends that Fluharty's testimony was expert testimony, as it was based on observations gleaned from his work as a supervisor and not from having witnessed the incident in question. Because WMATA did not identify Fluharty as an expert in its answers to Queen's pretrial interrogatories, Queen alleges WMATA violated Fed.R.Civ.P. 26(b)(4)(A)(i), requires a party to identify upon request in advance of trial its expert witnesses and the substance of their anticipated testimony.

Insofar as Fluharty testified on direct examination about the manner in which the rear of an articulated bus moves when the front portion is turned, *see* A.470–82, we agree that his was expert, not lay, testimony. As the advisory committee notes to Fed.R.Evid. 702 ("testimony by experts") observe:

> The rule is broadly phrased. The fields of knowledge which may be drawn upon are not limited merely to the 'scientific' or 'technical' but extend to all 'specialized' knowledge. Similarly, the expert is viewed, not in a narrow sense, but as a person qualified by 'knowledge, skill, experience, training or education.' Thus within the scope of the rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values.

A transit authority supervisor's testimony about the nuances of movement of a bus segment based on his experience and training surely satisfy this broad definition. The trial judge's refusal to identify Fluharty as such was error.[10]

We cannot conclude, however, that the nondesignation of Fluharty created the degree of surprise that deprives a party of a fair hearing and thereby warrants reversal. In its pretrial brief, WMATA specifically

9. Even were we to conclude that the refusal to sequester Jenkins was error, Queen has made no showing of the "sufficient prejudice [needed] to require reversal." *United States v. Bobo,* 586 F.2d 355, 366 (5th Cir.1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1546, 59 L.Ed.2d 795 (1979); *Government of Virgin Islands,* 625 F.2d at 474. Moreover, the fact that Jenkins' deposition had been taken before trial, thereby giving Queen's counsel prior statements with which to impeach her, would seem to prevent Jenkins from credibly modifying at trial the important elements of her account of the accident.

10. WMATA's contention that Fluharty's was lay testimony because based on "Fluharty's actual perceptions," *see* Brief for WMATA at 41, rests upon too narrow a definition of expert testimony. Nor do the two cases WMATA offers in support of its contention control this case. *United States v. Pierson,* 503 F.2d 173 (D.C. 1974), involved the testimony of a police officer

designated Fluharty as one of its trial witnesses. It stated that Fluharty would testify about WMATA regulations and operating procedures. Although WMATA did not suggest that Fluharty would also discuss whether an articulated bus might encroach upon a sidewalk when it turned, that omission is attributable to the fact that Queen, in his pretrial brief, nowhere revealed his distinctive articulated bus theory, focusing instead on the alleged negligence of bus driver Jenkins. Under these circumstances, it was well within the discretion of the trial judge to allow Fluharty to testify to rebut this theory, even if in so doing here Fluharty crossed the line between lay and expert testimony. *See, e.g., Murphy v. Magnolia Electric Power Ass'n*, 639 F.2d 232, 235 (5th Cir.1981); *DeMarines v. KLM Royal Dutch Airlines*, 580 F.2d 1193, 1201–02 (3d Cir.1978). Moreover, Fluharty's testimony, while that of an expert, was hardly so specialized or technical as to confuse the unsuspecting attorney; to suggest, as does Queen, that Fluharty's testimony provided a "significant new dimension [that] took Mr. Queen's counsel by surprise," Brief for Queen at 43, blinks credibility. In any event, Queen made no motion for a continuance at trial, which would have been the appropriate remedy in order to allow him to prepare for Fluharty's testimony or to obtain another expert. He therefore can hardly be heard to suggest, as he does now, *see id.*, that the trial judge committed reversible error in not granting him one.

### CONCLUSION

For the reasons stated in the foregoing, we affirm the judgment entered by the district court in favor of WMATA.

*It is so ordered.*

about the likely trajectory of a bullet based on the hole the bullet left in a wall; unlike this case, the officer had personally witnessed the bullet hole at the crime scene, and the court therefore concluded "'a layman, under certain circumstances can look at a bullet hole in a wall and see whether it appears to come from one direction or another'.... No special expertise is required." (quoting district court opinion).

*Brady v. Chemical Construction Corp.*, 740 F.2d 195 (2d Cir.1984), involving the testimony of an investigator hired by a company to track the activities of an employee, is similarly inapposite, for the investigator's testimony consisted only of "facts that he personally had learned during his investigation," *id.* at 200, not, as in this case, knowledge gleaned from his experience or training.