**Annabelle LIPSETT, Plaintiff,**

v.

**UNIVERSITY OF PUERTO RICO, et al., Defendants.**

**Civ. No. 83–1516 (JP).**

United States District Court, D. Puerto Rico.

March 13, 1991.

---

Charles S. Hey Maestre, José Antonio Lugo and Judith Berkan, Río Piedras, P.R., for Annabelle Lipsett.

Isabel Muñoz Acosta, Asst. U.S. Atty., Hato Rey, P.R., for Rivé Mora.

Rubén Nigaglioni and James D. Noel, III, Ledesma, Palou & Miranda, Hato Rey, P.R., for University of Puerto Rico, et al.

## OPINION AND ORDER

PIERAS, District Judge.

The Court has before it several post trial motions. The individual state defendants Dr. Gumersindo Blanco, Dr. José R. González Inclán, and Dr. Pedro J. Santiago Borrero have filed a Motion for Judgment Notwithstanding the Verdict (judgment n.o.v.) under Rule 50(b) of the Federal Rules of Civil Procedure or for a New Trial pursuant to Rule 60(b)(1) and (3) of the Federal Rules of Civil Procedure. This motion also incorporates a request for New Trial under Rule 59 because defendants claim they were prejudiced by surprise testimony presented at the trial. These defendants have further filed a motion request-

ing a new trial, or in the alternative, a remittitur pursuant to Rule 59 of the Federal Rules of Civil Procedure. In addition, plaintiff has requested equitable relief, including an injunction ordering her to be promoted to the fourth year of the Residency Program at the University of Puerto Rico ("UPR") Medical School, Surgery Division. Finally, the federal defendant, Dr. Ernesto Rivé Mora has filed a motion requesting attorney's fees.

For the reasons stated below, we deny the defendants' and plaintiff's motion. The government's motion for attorney's fees is also denied.

## I. BRIEF STATEMENT OF FACTS AND PROCEDURAL HISTORY

This is the final chapter in the chronicles of a case which has continued over the course of seven years, several published opinions and, finally, a jury trial. *See Lipsett v. University of Puerto Rico,* 576 F.Supp. 1217 (D.P.R.1983); *Lipsett v. University of Puerto Rico,* 637 F.Supp. 789 (D.P.R.1986); *Lipsett v. Rivé Mora,* 669 F.Supp. 1188 (D.P.R.1987), *rev'd and remanded in part, Lipsett v. University of Puerto Rico,* 864 F.2d 881 (1st Cir.1988); *Lipsett v. University of Puerto Rico,* 745 F.Supp. 793 (D.P.R.1990).

In short, this action was brought by a female surgery intern in the University of Puerto Rico General Surgery Residency Training Program. The plaintiff sought damages and declaratory and injunctive relief against the UPR's School of Medicine and several of its officers. She claimed that while she was attending the General Surgery Residency Training Program at UPR, she was subjected to unconstitutional sex discrimination. Her specific claims were that she was sexually harassed while she was an intern in the Surgery Program, and that she was not promoted to the fourth year residency level of the five-year Surgery Program because of her sex.

After the district court granted summary judgment in favor of the defendants, *Lipsett,* 637 F.Supp. at 813, the plaintiff appealed. The First Circuit reversed and remanded the case for a trial on the merits.

*Lipsett,* 864 F.2d at 915.[1] On May 24, 1990, the case proceeded to trial. On June 20, 1990, the jury returned a $525,000 verdict in favor of the plaintiff, concluding that several of the defendants had sexually discriminated against the plaintiff. Specifically, the jury found that defendants Dr. Gumersindo Blanco, Director of the Department of Surgery and Chairman of the University of Puerto Rico and Affiliated Hospitals Residency Training Program from 1976 to 1983, Dr. Jose R. González Inclán, Acting Director of the Department of Surgery Residency Training Program from 1981 to 1983, and Dr. Pedro Juan Santiago Borrero, Dean of the School of Medicine of the University from 1980 to 1983, acting as supervisors, committed gross negligence in violation of plaintiff's constitutional right to be free from sexual discrimination by condoning, encouraging, or acquiescing in discriminatory conduct.

Before the case went to trial, the parties stipulated to certain facts. In order to aid the reader in understanding this case, we will, as briefly as possible, reiterate the most relevant of these stipulated facts. The General Surgery Training Program is a five-year program leading to certification as a General Surgeon. It is of a pyramidal nature, with approximately five residents completing the program each year. Between 1960 to 1982, 69 men and 5 women completed the program. During the said time period 3 of the women served as chief residents in the years 1973, 1974 and 1979. In 1983 there was also a female chief resident. Annabelle Lipsett is a graduate of medical school who applied and was accepted into the UPR Graduate Surgery Program in 1980. At the end of the academic year 1980–1981, Annabelle Lipsett was promoted to her second year of residency. During the second year of the program 1981–1982, Annabelle Lipsett was placed on probation. Dr. Lipsett completed her second year and was promoted to the third

year in June, 1982. After the promotion to the third year, the faculty of the General Surgery Training Program decided to dismiss Dr. Lipsett from the program effective at the end of her third year, in June 1983. During the academic year 1982–1983, Dr. Lipsett was allowed to remain in the Program and appealed her dismissal. The appeal was unsuccessful and Dr. Lipsett's dismissal from the Program became effective on June 30, 1983. During 1981, Annabelle Lipsett obtained a percentile score of 79 on the US American Board of Surgery nationally administered in-training exams in surgery,[2] and during 1982, she obtained a percentile score of 98 on the same exam. In 1983, Dr. Lipsett obtained a percentile score of 99 on the US American Board of Surgery nationally administered in-training exams in surgery.

Drs. Pedro J. Santiago Borrero, Gumersindo Blanco and José R. González Inclán are included in this case with respect to the claims for sexual harassment insofar as they were supervisors of the alleged harassers and officers of a program which the plaintiff alleged to have been plagued with hostile environment type of sexual harassment. However, none of the mentioned doctors personally carried out any type of sexual harassment against Dr. Lipsett. That is, these codefendants (the state defendants) did not carry out any unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature against the plaintiff.

## II. DISCUSSION

### A. Rule 60(b) Motion

The state defendants claim that the Court should grant them a new trial because the plaintiff committed perjury and fraud during her testimony at trial. The plaintiff counters that she did not commit perjury, and that her testimony was con-

---

1. For a more thorough discussion of the procedural history of the case, see *Lipsett v. University of Puerto Rico,* 864 F.2d 881 (1st Cir.1988).

2. *These exams are a prerequisite to advancing a resident into the next year of the Surgery Program. See* plaintiff's Exhibit, General Surgery

Residency Training Program Brochure at 8. According to the testimony of Dr. Mas, a score of 17 on the nationally administered in-training exams in surgery was the lowest possible score that the UPR accepted in order to advance a resident in the program.

sistent and truthful through seven long years of litigation; alternatively, even if such perjury occurred, plaintiff contends that the defendants have not adequately shown that a new trial should be granted.

Rule 60(b) provides, in pertinent part, that

[o]n motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (3) *fraud* (whether heretofore denominated intrinsic or extrinsic), *misrepresentation,* or *other misconduct of an adverse party....*

(Emphasis supplied.)

Rule 61 of the Federal Rules further provides that no error or defect in any ruling or order by the court or in any action taken by the parties is ground for granting a new trial or setting aside a verdict unless "refusal to take such action appears to the court inconsistent with substantial justice."

The First Circuit has, on numerous occasions, stated that motions made pursuant to Rule 60(b) are "addressed to the discretion of the district court, may be granted only under exceptional circumstances, and may be reviewed only for abuse of discretion." *González v. Walgreens Co.,* 918 F.2d 303, 306 (1st Cir.1990) (remaining citations omitted); *Anderson v. Cryovac, Inc.,* 862 F.2d 910, 923 (1st Cir.1988). Also, it has elaborated upon the different types of acts constituting "fraud," "misrepresentation," or "misconduct," which would fall within the purview of subsection (3) of Rule 60(b). *See, e.g., Anderson,* 862 F.2d at 923 (discussing meaning of "misconduct" under Rule).

■ In the instant case, the defendants allege that the plaintiff committed perjury during trial when she testified about her attempts to mitigate damages by applying to other training programs in order to continue her surgery training after she was informed that her contract would not be renewed for the 1983/1984 year. Specifically they argue that she falsely stated that she submitted an application to "Hospital Municipal," the San Juan Municipal Hospital, sometime around 1984 or 1985. *See* Tr. 171, 274–276 (plaintiff's testimony). According to the defendants, prior to trial, the plaintiff testified, during her 1983 deposition, that she made no formal application to the San Juan Municipal Hospital. *See* 1983 Deposition of plaintiff, Tr. 76. In support of this contention, defendants submit an affidavit of Dr. Mariano Blasini Rivera, Director of the Medical Education Program of the San Juan Municipal Hospital Surgery Residence Program from 1976 until 1985, and Director of the Surgery Department and Surgery Residence Training Program from 1985 until 1989, stating that Dr. Lipsett never submitted an application for admission to the San Juan Municipal Hospital Surgery Residency Program.[3] Defendants contend that plaintiff's alleged false testimony was willfully and purposely offered in an attempt to deny them the opportunity to properly present the defense of failure to mitigate damages. They label this conduct a "consistent and systematic pattern of perjury and fraud upon the Court," which circumvented their opportunity to fairly present their defense. We disagree.

■ According to the First Circuit, the commission of a "fraud upon the court" is a serious abuse which can sometimes result in the ultimate sanction—dismissal of the case—when one has "defiled the judicial system." *Aoude v. Mobil Oil Corp.,* 892 F.2d 1115, 1118 (1st Cir.1989). A "fraud on the court" occurs when it can be demonstrated, through clear and convincing evidence, that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly

---

**3.** We note that this evidence was never introduced in Court in an attempt to impeach the witness. Similarly, plaintiff has submitted documents, including a June 19, 1984 letter from Dr. Juan R. Vilaró, which were not admitted as evidence during trial. Because of the seriousness of defendants' perjury allegation, we consider all of these documents in determining the legitimacy of defendants' allegation.

hampering the presentation of the opposing party's claim or defense." *Id.* at 1119 (citations omitted). *See also Sandstrom v. Chemlawn Corp.*, 904 F.2d 83, 88 (1st Cir. 1990) (citing *Aoude*) (fraud on the court requires the litigant and lawyer to "concoct" an unconscionable scheme calculated to impair the court's ability to impartially adjudicate a dispute).

The defendants have failed to show any type of unconscionable scheme, as contemplated by the rule, perpetrated by the plaintiff and her attorneys in an attempt to hamper the administration of justice in this case.[4] A review of the record reveals that plaintiff's allegedly perjured statement was insignificant at best, if false at all. As plaintiff has pointed out, the deposition testimony to which the defendants refer was taken in a deposition held on August 12, 1983, only one and one half months after plaintiff was dismissed from the program at the UPR, and a year before she applied to the San Juan Municipal Hospital Program. Moreover, the question posed at the deposition asked about what actions the plaintiff had taken to obtain admission into another residency when the plaintiff was in her *second year* and going into her third year. Tr. at 74. Plaintiff responded that she took the initial steps in pursuing an appeal of the decision not to renew her fourth year contract, as she understood that the decision was not final. *Id.* at 74–75. Also, she stated that she began to investigate whether any programs would be open to accepting a fourth year resident and what would be the opinion of the heads of these programs regarding the acceptance of women residents who had been expelled from other programs. The San Juan Municipal Hospital was one of these programs. *Id.* At trial, plaintiff was questioned as to what arrangements she made to transfer to other residency programs *after completion of her third year.* Tr. 171. Plaintiff responded that she "submitted an application" to "Hospital Municipal" (San Juan Municipal Hospital) "[s]ometime around 1984 or '85." *Id.* Thus, plaintiff did not formally inquire into the program at the Municipal Hospital until June of *1984*, when she wrote a letter to Dr. Juan Vilaró, Director of the Surgery Department, requesting admission to the program.[5] One week later, he wrote back, informing her that there were no vacancies for fourth year residents at that time, but should one become available, he could submit her name to the Surgery Committee. *See* plaintiff's Opposition to defendant's Motion for Judgment Notwithstanding the Verdict, Exhibit B and attached certified translation. *See also* Tr. from trial 171; 274–276 (plaintiff applied to San Juan Municipal Hospital program "sometime around 1984 or 1985" but did not get in because "they didn't have a place for a fourth-year resident.").

Thus, plaintiff's trial testimony regarding her application to the San Juan Municipal Hospital Program is not a false representation of what was stated during her 1983 deposition. Moreover, although the plaintiff did not file a formal application to the Municipal Hospital Program, the filing of such an application would have been futile since she had been informed that there were no spaces available for fourth year residents. Therefore, we conclude that no fraud was committed upon the Court, and we are compelled to deny defendants' request for a new trial under Rule 60(b)(3) based on this contention. In view of this ruling, we also grant plaintiff's request to strike from the record defendants' allegations of perjury pursuant to Rule 12(f) of the Federal Rules of Civil Proce-

---

4. In legal support of their contention, defendants cite a Supreme Court of New Jersey case, *Shammas v. Shammas*, 88 A.2d 204 (1952) which, aside from pertaining to the non-binding context of the New Jersey Rules of Civil Procedure, presents a fact pattern completely distinct from the present case—defendant's denial under oath that he entered into a bigamous marriage and committed adultery.

5. Testimony at trial revealed that Dr. Juan Vilaró is the grandfather of plaintiff's first-born child. The father of this child is Dr. Charles Vilaró Nelms, a doctor who was a resident in the UPR Surgery Program and with whom plaintiff had an intimate relationship. Tr. 177.

dure.[6]

### B. Rule 59 Motion for New Trial Based on Surprise

Defendants further insist that during trial, the plaintiff testified about specific new instances of sexual harassment, labeled the "juicy stuff," which she neglected to disclose to the defendants over the course of this seven-year litigation. According to defendants, plaintiff reserved these specific acts of sexual harassment for trial, which constituted the strongest evidence of sexual harassment, in order to inflame the passion of the jury. Because of this testimony, defendants claim they were victims of unfair surprise and are therefore entitled to a new trial under Rule 59 of the Federal Rules of Civil Procedure. The plaintiff counters that Rule 59 provides a means of relief when a party has been made the victim of unfair surprise, but this relief will be denied if that party failed to seek a continuance.

Rule 59 states that the court may grant a new trial to all or any of the parties and on all or part of the issues "in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States...." As previously mentioned, Rule 61 of the Federal Rules further provides that no error or defect in any ruling or order by the court or in any action taken by the parties is ground for granting a new trial or setting aside a verdict unless "refusal to take such action appears to the court inconsistent with substantial justice."

■ Rule 59 grants relief to a party which has unfairly been made the victim of surprise, but such relief will generally be denied if the party failed to seek a continuance. *See Conway v. Chemical Leaman Tank Lines, Inc.*, 687 F.2d 108 (5th Cir. 1982) (granting of continuance is generally preferable remedy for prejudicial error due to surprise testimony, although no ironclad rule requires it). *See also* 11 Wright & Miller, *Federal Practice and Procedure* § 2805 at 38 (1973). An underlying principle of Rule 59 is that "a new trial will not be granted on grounds not called to the court's attention during the trial unless the error was so fundamental that gross injustice would result." *Id.* at § 2805 at 39. In order to grant a new trial within the dictates of Rule 61 then, the district court must find that the admission of the surprise testimony was prejudicial to the case, *Conway*, 687 F.2d at 112 (citing Moore, *Federal Practice* paragraph 59.08[2] at 59–111 (2d ed. 1982)), and that in essence, the party alleging prejudice was deprived of a fair hearing. *Brady v. Chemical Construction Corp.*, 740 F.2d 195 (2d Cir.1984).

■ Defendants' claim of unfair surprise focuses upon plaintiff's failure to reveal, during her depositions or other pre-trial testimony, the exact language or specific words certain residents used and certain events which occurred while plaintiff was a resident in the Surgery Program. This alleged "surprise" testimony includes the following: the use of the words and phrases "mamita," (baby), "Mira tú, que buena estás," (Look, how well stacked you are), "en celo" or "bellaca" (in heat or horny) by Dr. Rehuel Rivera, a medical resident who in his third year of training when plaintiff was in her first year; the existence of a sexually explicit drawing of a sphinx; an incident in which Dr. Rivera invited the plaintiff to go for a ride with him on the Caguas highway in his Porsche; an incident where Doctors Rivera and Mas burst into operating room and called a patient a prostitute because her "tubes were tied"; and an incident when Dr. Morales Otero, a fourth year resident when plaintiff was in her second year, told the plaintiff he did not want women in his service because they menstruated and had to apply make

---

**6.** These allegations include references to plaintiff engaging in "foul play" and "misbehavior," requesting the Court to refer the "perjury evidence" to the "appropriate authorities" and asserting that "plaintiff cannot be allowed to reap the profits of wrongful conduct that denigrate the dignity of this Court and makes a mockery of our judicial system." *See* defendants' Memorandum in Support of Motion for Judgment No Obstante Veredicto at 12–13, 65–66.

up.[7]

After reviewing the record, we conclude that the purported discrepancies between plaintiff's statements provided through pretrial discovery and her trial testimony were not of such scope to unduly prejudice defendants and substantially affect their rights so as to warrant the granting of a new trial. When the plaintiff testified as to these matters, the defendants objected. Tr. 59–61. After this initial objection, plaintiff continued to testify.[8] A request for a continuance or a new trial was not made, and no further attempts to cure the alleged prejudicial new testimony were made. Tr. at 59. Thus, in effect, defendants waived this argument by failing to initiate some action to cure the prejudice. *See Twigg v. Norton Co.*, 894 F.2d 672, 675 (4th Cir.1990) (moving for mistrial was sufficient notice to court that party deemed certain testimony prejudicial to its case); *Marino v. Otis Engineering Corp.*, 839 F.2d 1404, 1411 (10th Cir.1988) (failure to cure alleged prejudice results in waiver of claim of surprise). Even if the defendants had not waived this argument though, the allegedly prejudicial testimony did not change any theory of the case and did not add any new issues to the case, and therefore, did not deprive the defendants of an opportunity for a fair hearing. *See, e.g., Twigg*, 894 F.2d at 675 (change in theory of liability from deposition to trial testimony during cross examination was prejudicial and warranted new trial since defendant was not given opportunity to satisfactorily prepare rebuttal of new theory of liability); *Conway*, 687 F.2d at 112 (surprise testimony introducing new theory

of case was unfair and prejudicial and warranted granting of new trial). *Cf. F & S Offshore, Inc. v. K.O. Steel Castings, Inc.*, 662 F.2d 1104, 1109 (5th Cir.1981) (in non-jury context, defense expert witness' testimony did not constitute undue surprise when witness' name was available to plaintiffs, general subject of testimony was known, and testimony did not create any new issues). As the plaintiff points out, this testimony did not constitute new allegations of sex discrimination and sexual harassment, but was merely a small part of the totality of evidence presented at this month-long trial and was, essentially, cumulative evidence which further supported plaintiff's claims of sex discrimination.

Moreover, a perusal of defendants' cross examination of the plaintiff establishes that defendants thoroughly cross-examined and attempted to impeach the plaintiff regarding this alleged prejudicial testimony. For example, during cross examination, the plaintiff was extensively questioned about whether she used the specific words or described the incidents she testified to at trial in either of her depositions or in Joint Exhibit XI, plaintiff's December 2, 1982 petition to the faculty for reconsideration. *See* Tr. 186–206. Also, during cross-examination, the parties stipulated that certain words and incidents did not appear in the transcript of plaintiff's 1983 and 1989 depositions. Tr. 193–201. Therefore, in view of defense counsel's "vigorous … and effective cross examination of the witness … [which] does not bear the marks of one whose ability to test a witness has been impaired by surprise testimony and his fail-

---

7. Other alleged surprise testimony defendants are objecting to consists of: plaintiff's statement that Dr. Rivera used her nickname, created by the male residents, "Selastraga" (she swallows them), as well the names "Esfinge" (sphinx) and Cleopatra, *every day* and actually called her those names "to her face"; and other specific comments made to plaintiff by Drs. Rivera and Otero. For a complete delineation of the exact statements that defendants are objecting to, see defendants' Motion Requesting The Court to Enter Judgment No Obstante Veredicto at 19–27.

8. The Court recessed for the day, and the parties met in chambers. Tr. 60–61. When Court was reopened after a holiday weekend, an instruc-

tion regarding plaintiff's testimony was read to the jury:

The Court has permitted the plaintiff to elicit testimony of statements allegedly made by some residents of the general surgery training residency program. Said testimony was submitted solely for the purpose of establishing plaintiff's claim that a sexually [hostile] environment existed in the residency program. Said testimony is not submitted for the purpose of establishing the veracity of the statements allegedly made by the residents.

After this instruction was read, no further objections to this testimony were made.

ure to request a continuance," we are compelled to determine that defendants' counsel felt no such impairment. *Marino*, 839 F.2d at 1411 n. 13.

Defendants claim that the plaintiff's cross examination did not cure the "misconduct since the verdict evidences that the cross-examination was ineffective and did not neutralize the explosive new testimony." However, after reviewing plaintiff's pretrial statements and testimony at trial, we must disagree. The subject of much of plaintiff's alleged surprise testimony, Dr. Rehuel Rivera, testified at trial, denied calling the plaintiff "mamita," confirmed that there was a drawing of a sphinx on the bulletin board in "La Cueva," the males resident's resting facility, and denied that such a drawing was sexually explicit. Also, plaintiff's Amended–Amended Complaint states that she had been told by Dr. Morales Otero, "that women should not enter general surgery because women need time to bathe, to go to the bathroom, to apply make-up, to dress-up, etc., and that in general surgery one had not time for those things." Amended–Amended Complaint filed March 30, 1984, paragraph 30.

In summary then, we cannot agree that defendants were unduly prejudiced by plaintiff's testimony. Defendants received their "day in court," and in view of the aforementioned considerations, we are satisfied they were afforded a fair hearing before the jury. The jury considered all testimony and other evidence submitted during the trial, and decided in favor of the plaintiff.

### C. Rule 50 Motion

The state defendants next argue that this Court should enter Judgment n.o.v. because the alleged acts of sexual harassment and discrimination by the residents were not performed under "color of state law" and therefore cannot be the basis for supervisory liability under 42 U.S.C. § 1983. Also, the defendants claim that they had a legitimate, non-discriminatory reason for dismissing the plaintiff from the Surgery Program and that no reasonable juror could have concluded that their rea-

sons were a pretext for discrimination, even when the evidence is viewed in the light most favorable to the plaintiff. Finally, defendants urge us to grant them the protection of qualified immunity based on the fact that the law related to sexually hostile work environment and the law imposing supervisory liability were not "clearly established" at the time that the plaintiff attended the Surgery Program.

Rule 50(b) of the Federal Rules of Civil Procedure provides that a party who has moved for a directed verdict "may move to have the verdict and any judgment thereon set aside and to have judgment entered in accordance with the party's motion for a directed verdict...." On a motion for judgment notwithstanding the verdict,

> The trial judge must view all of the evidence and inferences flowing therefrom in the light most favorable to the non-moving party. Such a motion should be granted only if, as a matter of law, no conclusion but one can be drawn.

*Foley v. Rust International*, 901 F.2d 183, 184 (1st Cir.1990) (citing *Austing v. Lincoln Equipment Associates, Inc.*, 888 F.2d 934, 937 (1st Cir.1989)). If fair-minded jurors could differ, then the judgment n.o.v. cannot stand. *Jorgensen v. Massachusetts Port Authority*, 905 F.2d 515, 522 (1st Cir.1990). However, "the party for whom the jury found is not entitled to 'unreasonable inferences which rest on conjecture and speculation.'" *Id.* (citing *Redgrave v. Boston Symphony Orchestra, Inc.*, 855 F.2d 888, 896 (1st Cir.1988 (en banc), *cert. denied*, 488 U.S. 1043, 109 S.Ct. 869, 102 L.Ed.2d 993 (1989)). The decision to grant the motion "must be made without evaluating the credibility of the witnesses or the weight of evidence and without attempting to resolve conflicting testimony." *MacQuarrie v. Howard Johnson Co.*, 877 F.2d 126, 128 (1st Cir.1989).

At the close of all evidence in the case, the defendants moved for a directed verdict, thereby preserving their right to move for judgment n.o.v. *See* Fed.R.Civ.P. 50. The Court denied the motion. As mentioned above, the jury found for the plaintiff. Defendants have renewed their mo-

tion as a motion for judgment non obstante veredicto.

### 1. *Color of Law*

The defendants first claim that they are entitled to Judgment n.o.v. because "the residents' sexist remarks and conduct, no matter how abusive or offensive, were not pursued under color of state law" and "were not related to the duties and powers incidental to the position of a resident" so that their behavior could not violate the plaintiff's constitutional rights. Therefore, the individual defendants cannot be held liable as supervisors under section 1983 for their alleged reckless disregard of the residents' behavior. This argument is without merit.

■■■ Title 42 U.S.C. Section 1983 provides that "Every person who, *under color* of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured. . . ." (Emphasis supplied.) The Supreme Court has determined that if a defendant's alleged infringement of a plaintiff's constitutional right satisfies the state-action requirement of the Fourteenth Amendment, the defendant's conduct also constitutes action "under color of state law" for purposes of section 1983, because the conduct is "fairly attributable to the state." *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40, 49 (1988) (citing *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 935, 937, 102 S.Ct. 2744, 2752, 2754, 73 L.Ed.2d 482 (1982)). The traditional definition of "under color of state law" requires the defendant in a section 1983 action to have exercised power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *United States v. Classic*, 313 U.S. 299, 325–26, 61 S.Ct. 1031, 1042–43, 85 L.Ed. 1368, 1383 (1941). *See also Atkins*, 487 U.S. at 49, 108 S.Ct. at 2255; *Murphy v. Chicago Transit Authority*, 638 F.Supp. 464, 467 (N.D.Ill.1986) (a person acts "under color of state law" when he "engages in conduct that is relat-

ed to state authority conferred on the person, even though that authority does not in fact permit the conduct."). Usually state employment is sufficient to render the defendant a state actor for purposes of section 1983, if state action is detectable under the factual context of a particular case. *See Lugar*, 457 U.S. at 935 n. 18, 102 S.Ct. at 2752 n. 18 (discussing decision in *Polk County v. Dodson*, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981), in which public defender, although state employed, was not acting "under color of state law" in day-to-day defense of client, because he was acting under canons of professional ethics in a role adversarial to the state).

In arguing that the residents who made the sexually discriminatory comments to plaintiff were not acting "under color of state law" defendants rely on *Murphy v. Chicago Transit Authority*, 638 F.Supp. 464 (N.D.Ill.1986). In that case, plaintiff was a staff attorney alleging that humiliating and degrading sexist remarks and actions made by her fellow workers were sexually discriminatory. Plaintiff complained of the conduct to the defendant supervisors, who took no corrective action, and began assigning plaintiff to menial, demeaning tasks which had previously been shared by all staff attorneys. The court held that plaintiff's coworkers were not "acting under color of state law" because the actions were not related to the duties and powers incidental to the staff attorney job. According to the court's reasoning, the fact that the conduct occurred on the work premises did not render it "related to" the state authority since the behavior "bore no similarity to the nature of the staff attorney job." *Id.* at 468.

■ Defendants' reliance on *Murphy* is misplaced. This case presents a factual pattern totally distinct from *Murphy*, and the defendants fail to note a major difference between the "coworkers" in this case and those in *Murphy*. As explained above, the *Murphy* court emphasized the fact that the conduct of plaintiff's coworkers was unrelated to the duties and powers incident to the job of staff attorney. In this case,

all the comments made to plaintiff which were admitted into testimony were comments made by those residents who were ahead of plaintiff in the Surgery Program, and by explicit directive of the rules of the Program, acted as plaintiff's supervisors. In fact, the brochure for the General Surgery Program specifically delineates the duties and powers of "Associate Residents" and "Senior Residents" over "Assistant Residents." Associate Residents are those trainees in the Surgery Program who have completed an assistant residency of two years and have fulfilled certain training requirements. *See* Plaintiff's Exhibit 1 at 5. These residents are "directly responsible for the supervision of the Assistant Residents and medical students in the service." *Id.* at 6. The Senior Residents, those who have passed through assistant residency and associate residency and are adjudged by faculty as qualified, are "responsible for the day running of the service to which they are assigned. They will supervise the medical students, assistant residents and associate residents in the services...." *Id.* at 6–7. Finally, the "Chief Resident," in addition to being a senior resident, is the official representative of the resident staff, and has an entire list of additional responsibilities which includes "participat[ing] in the evaluation of interns and residents." *Id.* at 7, 16–17.

Thus, because the sexually discriminatory comments and actions referred to by defendants in their motion were carried out by Dr. Morales, a fourth year when plaintiff was in her second, Dr. Rivera, a fourth year when plaintiff was in her second year, and Dr. Novoa, the Chief Resident when plaintiff was in her second year, and all these residents were ahead of plaintiff in the Surgery Program, they were clothed with supervisory powers over the plaintiff as *mandated* by the policy of the program and the strict hierarchical nature of the program emphasized at trial, and imposed by the accreditation requirements, as defendant Dr. González Inclán stated during trial. Therefore, we must conclude that

these residents were acting directly under color of state law as their conduct was "related to the state authority conferred on [them]" and related to the nature of the powers and duties assigned to them. *Murphy*, 638 F.Supp. at 468. The surgery residents who made the sexually discriminatory comments to the plaintiff were plaintiff's supervisors. In fact, according to the defendants, her failure to follow some of these residents' orders was the very reason that she was discharged from the Program. As one commentator has noted, this type of abuse of power in the supervisory-underling relationship is the essence of the "classic" definition of sexual harassment in any setting: the exploitation of a power relationship. Greff Schneider, *Sexual Harassment and Higher Education*, 65 Tex.L. Rev. 525, 534–35 (1987).

### 2. *Legitimate Non–Discriminatory Reason to Discharge Plaintiff*

■■■■ Defendants claim that regardless of whether sexual harassment and discrimination occurred within the Surgery Program, no reasonable juror could have concluded the plaintiff was dismissed from the Program because of sex discrimination, even when all the evidence is viewed in the light most favorable to the plaintiff. As the Circuit Court pointed out, the defendants could be held liable if the complaints directed against the plaintiff by the male residents were so infused with discriminatory bias as to render them pretextual, and the defendants had good reason to suspect this pretext, but nevertheless used the complaints as a basis for discharging plaintiff from the program. *Lipsett*, 864 F.2d at 903.[9] After carefully considering the evidence presented at trial, we are compelled to deny defendants' request for Judgment n.o.v. as we conclude that a reasonable juror, based on both direct and circumstantial evidence presented at trial, could have found that plaintiff was dismissed from the program on the basis of her sex.

For example, a major incident of abandonment of her duties mentioned during

---

**9.** In our analysis of this aspect of defendants' Judgment n.o.v. motion, we use the Circuit Court's thoughtful examination and discussion

of plaintiff's claim of discriminatory discharge in guiding our decision. *See Lipsett*, 864 F.2d at 907–912.

trial as one of plaintiff's disciplinary breaches and referred to in the December 2, 1981, complaint against plaintiff presented to Dr. Blanco (Plaintiff's Exhibit 14) which led to placing her on probation, was an incident occurring on November 11, 1981. Plaintiff, as a second year resident, had been assigned to rotate through the University Hospital under Dr. Ramírez Sánchez (a fifth year) and Dr. Rivera (a fourth year). They ordered her to remain all day in the Intensive Care Unit, which, according to the plaintiff, was not the normal procedure for a second year resident. When Dr. Lipsett first questioned why she was assigned to this duty, rather than a first year resident, Dr. Rivera told her to "Shut up," and Dr. Ramírez also offered her no explanation. When plaintiff appealed to the Chief Resident, Dr. Novoa, he told her that she was not to question orders, and that if he told her to "lick the floor," she would have to do it. Tr. 109. He then told plaintiff that if she appealed to anyone, "She would regret it," and that since she did not want to be a first year resident for one day, she would be one for the whole year, and would not operate at all. Tr. 110. (Testimony at trial revealed that the first year resident who would have been on duty that day, Dr. Martínez, was given authorization to leave the hospital by Dr. Rivera, because Dr. Martínez' wife had just given birth. However, Dr. Lipsett never discovered this fact until long after the incident occurred.) After this argument, plaintiff became upset and began to cry. She left and went to the female resident's resting facility, "La Cuevita." She attempted to call defendant Dr. González at home. After several tries, she was informed that he was not at home, and she should try in an hour. Tr. 110. Plaintiff then left the hospital for her sister's house, who lived about ten minutes away from the Hospital. After plaintiff finally reached the defendant, she told him about the treatment she received from Drs. Rivera, Ramírez and Novoa. Dr. González told her to "calm down" and go to her house. He also stated that he would call "the boys" at the hospital. Tr. 111.

Sometime thereafter, a meeting was held with defendant Dr. González and Drs. Lipsett, Rivera, Ramírez, Novoa, and Cuevas, the team working the day of the incident. Tr. 111. Plaintiff later met with Drs. Blanco and González, and told them of the treatment she felt she was experiencing in the program, including: sexual invitations she had been receiving from Drs. Rivera and Morales, Tr. 116, her feelings that the program was "male oriented" and that she felt uncomfortable, and Dr. Novoa's statements that women should not be surgeons and that during his "reign of terror," he was going to attempt to remove all women from the Surgery Program. Tr. 114. The plaintiff also testified that when she discussed these matters with Dr. Blanco, he gave her some examples of other female doctors who had left the program. *Id.* Dr. Blanco stated that he was "flabbergasted" by the plaintiff's accusations, and characterized plaintiff's complaints as "bizarre." The only investigation he made into the matter was an inquiry with Dr. Novoa, whose partial response to some of plaintiff's accusations about this incident as well as other alleged incidents of abandonment was, "This girl is a liar." Dr. Blanco then testified that he made no further investigation. On the basis of his conversations with the plaintiff and Dr. Novoa, Dr. Blanco said that he believed Dr. Novoa, and that he thought plaintiff's statement was an "excuse for another problem."

Because plaintiff had appealed to Dr. González, Drs. Novoa, Ramírez Sánchez and Rivera told the plaintiff not to "touch any of their patients," and for the remaining month she was on night duty with these doctors, she was not given the opportunity to operate. Tr. 112–113. This type of punishment against the plaintiff was particularly significant, as the stated purpose of the Surgery Program is to give the residents a "progressive surgical experience and responsibility after graduation from Medical School ... [and] insure the widest possible exposure which will provide the trainee with the clinical experience necessary...." Plaintiff's Exhibit I, General Surgery Residency Training Program Pamphlet at 3–4. Throughout the trial, the

testimony emphasized the importance of the residents obtaining the best and the most experience possible in operating on patients and performing surgery. *See, e.g.,* Tr. at 133.

As a result of the November 11, 1981, occurrence as well as two other alleged incidents of abandonment, which were also the subject of conflicting testimony at trial, plaintiff was placed on probation, while no action was taken against the male residents who had provoked plaintiff to leave the hospital, even though Dr. González had admitted, in his July 1982 letter dismissing plaintiff from the program, that plaintiff's alleged disciplinary breach was "attenuated by evidence of harassment from other members of the House Staff." Joint Exhibit VI at 1.

A reasonable juror also could have viewed as pretextual the complaints which formed the actual basis for discharging plaintiff, Joint Exhibits II and III, written five weeks after the incidents in the complaints allegedly occurred, and after plaintiff had already been informed that she was going to be promoted into the third year of residency. Plaintiff presented testimony that throughout her probationary period, she received satisfactory evaluations which contradicted the statements made by Drs. Torres and Cuevas in their complaints, and on the basis of these evaluations and a Surgery Department Staff meeting held on June 2, 1982 (held two weeks before the letters were sent), plaintiff was promoted to the third year of residency. *See* Joint Exhibit XXIV.

During trial conflicting testimony was presented raising the issue of whether the resident doctors writing these letters were specifically told by the defendants that they should write these letters. Dr. Torres testified that no one but his "conscience" told him to submit a letter in writing, and

that he talked to no one about the charges of admitting patients to a ward without permission, although he claimed that his complaint against Dr. Lipsett was the most "grave error" a resident could commit.[10] Also, he admitted that he never spoke to the plaintiff about these incidents because he expected her to tell him. He did not remember talking to Dr. Blanco about the matter. Dr. Cuevas testified that Dr. Rivé Mora and Dr. Blanco told him to submit a written complaint against the plaintiff since the faculty needed written evidence of the events they were complaining about. Dr. Blanco stated that he met with both Drs. Torres and Cuevas, on an unspecified date, and he told them he did not want to listen to "rumors" but if there were formal complaints, he would consider them, especially before June 10, 1982, when plaintiff's period of probation ended.

In addition, other evidence from which a juror could have inferred that the reasons for dismissing the plaintiff were based on her sex are: the characterization of another female doctor's actions as "unesplained [sic] and bizarre," attributing this behavior to the fact that the doctor "is married and has a young chield [sic] and these circumstances may be putting undue stress on her, so that her clinical work has turned *erratic* ..." (this resident was eventually told to settle her affairs at home or else drop out of the Program) (Joint Exhibit XV at 2) (emphasis added); defendants' preferential treatment toward men in the context of disciplinary infractions and other behavior which was arguably as serious as, or more serious than plaintiff's disciplinary breaches, including: the failure to take any disciplinary action against Dr. Rivera when, in violation of the rules of the program, he assumed the position of Chief Resident (Dr. Zenaida Méndez had already

---

**10.** Dr. Cuevas' complaint accused plaintiff of admitting patients to a different Service (a different ward in the hospital) from the one they were ordered to be admitted to, as well as deciding how to channel emergency room cases without complying with what had already been decided, so that all patients were admitted to Service A. Joint Exhibit II. Dr. Torres' letter contained similar accusations that the plaintiff admitted patients without consulting any supervisory figures. Joint Exhibit III. Plaintiff presented conflicting testimony that this was a common practice known as "piratería," or "robar pacientes," and that residents often admitted patients into the ward they were working in so that they would have the opportunity to operate on these patients. Tr. 133–134.

been appointed chief resident), except for imposing a three-day suspension of duties coinciding with the weekend; retaining Dr. Eduardo Rodríguez in the Surgery Program when several witnesses, including Dr. Mas,[11] testified that he had was not fit to be a surgeon; the failure to remove from the program Dr. Morales Otero who, in 1980, initially misdiagnosed a patient in the preoperative stage as having apendicitis when the post operative diagnosis revealed another condition, the result being that two incisions were made on the patient, the first one unnecessarily; and the failure to take any action against many of the male residents who regularly drank alcohol on Thursdays and would sometimes bring it back to La Cueva—a practice commonly known as "the liver rounds"—when a complaint was lodged against them.

Clearly, the above mentioned considerations are only partial highlights of some of the evidence and testimony which came before this Court throughout the month long trial of this case. After carefully considering all this testimony and evidence, we cannot agree with the defendants that the uncontroverted evidence at trial proved that sex was not the motivating factor in defendants' decision to discharge the plaintiff from the Surgery Program.

### 3. *Qualified Immunity*

Defendants claim that the law related to a sexually hostile work environment, which includes the sexual harassment carried out by the residents in plaintiff's surgery program, was not "clearly established" at the time plaintiff was discharged from the UPR Surgery Program so that the defendants could not have reasonably concluded that their actions violated the Equal Protection Clause. Thus, under the doctrine of qualified immunity, defendants cannot be held liable to the plaintiff. They further contend that the standard for imposing supervisory liability under 42 U.S.C. § 1983 was not clearly established until the issue of supervisor liability was decided when this case was appealed, *see Lipsett*, 864 F.2d at 899–931, and to hold otherwise would result in a retroactive application of the law and in effect "infuse on state officials strict liability."[12] We disagree.

■ Qualified immunity protects government officials from liability for "civil damages insofar as their conduct does not violate a clearly established statutory or constitutional rights which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Whether the official protected by qualified immunity may be held liable for the allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action. *Id.*, 457 U.S. at 819, 102 S.Ct. at 2739. In recent years, the Supreme Court has refined the qualified immunity inquiry by requiring that the right alleged to have been violated not be the right in the "abstract" general sense, but the right be "clearly established" in a more "particularized ... and more relevant sense: [t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 639–40, 107 S.Ct. 3034, 3038–39, 97 L.Ed.2d 523, 530–31 (1987). The First Circuit has reiterated these principles. Thus, the qualified immunity question often requires examining the specific circumstances involved in the case and determining certain factual issues pertaining to the qualified immunity issue. *Unwin v. Campbell*, 863 F.2d 124, 132 (1st Cir.1988). It has also noted that the "normative standard is objective and independent of the merit of plaintiff's underlying constitutional claim," so that a plaintiff who is entitled to prevail on the merits of the case is not

---

**11.** Dr. Mas stated that Dr. Rodriguez failed to follow orders, was irresponsible with patients, and "he fooled the system."

**12.** The Circuit Court stated that "defendants sued in their individual capacities, are of course, free to raise the qualified immunity defense at trial." *Lipsett*, 864 F.2d at 915. The defendants originally raised this argument in a Motion for Summary Judgment, which was denied. *See* Docket # 260. The Order denying the Summary Judgment based on this ground was clarified so that the defendants could raise the defense of qualified immunity at trial. *See* Docket # 270.

necessarily entitled to prevail on the issue of qualified immunity. *Morales v. Ramirez*, 906 F.2d 784, 787 (1st Cir.1990) (quoting *Collins v. Marina–Martinez*, 894 F.2d 474, 478 (1st Cir.1990)).

■ Our review of the relevant case law leads us to conclude that the "contours" of the law related to sexual discrimination under the Equal Protection Clause of the United States Constitution were sufficiently developed so that, when applied to the facts of this case, the defendants reasonably should have understood that their actions violated plaintiff's constitutional rights to be free from discrimination based on her sex. As the Supreme Court pointed out in *Anderson*, the specificity requirement does not mean that "an official action is protected unless the very action in question has previously been held unlawful, but it is to say that in the light of preexisting law the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640, 107 S.Ct. at 3039.

As early as 1979, the law was clear that discrimination on the basis of sex could constitute a violation of the equal protection clause. In *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), the Supreme Court stated that sex discrimination is a violation of the equal protection component of the Fifth Amendment, as long as it does not serve "important governmental objectives" and is not "substantially related to the achievement of those objectives." An essential element of the equal protection claim is purposeful discrimination. *Personnel Administrator v. Feeney*, 442 U.S. 256, 276, 99 S.Ct. 2282, 2294, 60 L.Ed.2d 870 (1979); *Washington v. Davis*, 426 U.S. 229, 239–42, 96 S.Ct. 2040, 2047–49, 48 L.Ed.2d 597 (1976). Thus, the law under the equal protection clause pertaining to discrimination on the basis of gender was clear—plaintiff could not be discriminated against on the basis of the fact that she was a woman.[13] Insofar as plaintiff's action encompasses a claim that the actions of certain residents and defendants, including the decision to discharge the plaintiff from the Surgery Program, were motivated by gender-based animus, *see* Jury Instructions at 5, 6, 11, 12, 13, 14, 18, the law was clearly established so that defendants cannot claim a reasonable person would not have known that at the time plaintiff was dismissed from the Program, it was unconstitutional to treat women in the Surgery Program differently from men.

Moreover, testimony at trial revealed that Dr. Blanco was aware that the law prohibited sex discrimination, as he admitted this on his redirect examination. He further testified that it would be inappropriate to treat people differently based on their sex. Also, at an Appeals Sub–Committee meeting Dr. Borrero held with many of the residents in the Surgery Program on May 5, 1983, Dr. Borrero questioned the female residents in the program, including Dr. Lianis Bidot, whether they had noticed any evidence of harassment or had felt discriminated against as a women in the Program. Viewed in the light most favor-

---

13. Because we conclude that the law was "clearly established" as to sexual discrimination under the Equal protection clause, we do not address whether the sexually hostile work environment/sexual harassment law was "clearly established" as the jury's findings did not distinguish/specify which of these types of discrimination occurred in the Program:

  ... [D]o you find that *sex discrimination, hostile environment, and/or quid pro quo sexual harassment* was so pervasive in the Surgery Residency Program that [the defendants knew or should have known about it]?
  YES X  NO___
  Verdict Form, docket # 321 (emphasis added). The Circuit Court pointed this distinction out when it declared that in viewing the record in

the light most favorable to the plaintiff, "it could be inferred that the atmosphere described by the plaintiff was so blatant as to put the defendants on constructive notice that sex discrimination permeated the Program. The most obvious example of the offensive atmosphere was the constant attack by male residents on the capabilities of the plaintiff and other female residents." *Lipsett*, 864 F.2d at 906 (emphasis added). The Court characterized these comments as "anti-female remarks" and noted that such statements which "belittle" a person's ability to perform on the basis of that person's sex, "are not funny." *Id.* It concluded that "viewing the record in favor of the plaintiff, the defendants *should* have known of sex discrimination **(and harassment)** in the Program." *Id.* (Emphasis in original, boldface added.)

able to the plaintiff, this trial testimony suggests that the defendants had knowledge that discrimination based on sex was a violation of plaintiff's rights.[14] As one court aptly commented, "[t]he right to be free of invidious discrimination on the basis of sex certainly is clearly established, and no one who does not know about it can be called 'reasonable' in contemplation of law." *Goodwin v. Circuit Court of St. Louis County, Missouri,* 729 F.2d 541, 546 (8th Cir.1984).

█ Defendants' argument that the precise standard of supervisory liability to be applied in this case was not clearly established until the Circuit Court dictated it in *Lipsett,* 864 F.2d 881 (1st Cir.1988), must also fail.[15] Defendants contend that the First Circuit's established law on supervisory liability did not emerge until 1986, in *Voutour v. Vitale,* 761 F.2d 812 (1st Cir. 1985), *cert. denied,* 474 U.S. 1100, 106 S.Ct. 879, 88 L.Ed.2d 916 (1986), which was discussed by the Court in *Lipsett.* However, the Supreme Court began to use the "affirmative link" concept, which has been vital to imposing supervisory liability in section 1983 causes of action, as early as 1976. In two class actions alleging a pervasive pattern of unconstitutional police mistreatment of minority citizens brought against the Mayor of Philadelphia, the City Managing Director, and certain supervisory police officials, the Court stated: "a central ... paradox permeates [the district] court's legal conclusion. Individual police officers *not named as parties* to the action were found to have violated the constitutional rights of particular individuals, only a few of whom were parties plaintiff. As the facts developed, there was **no affirma-**

tive link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy ... showing their [defendants'] **authorization or approval of such misconduct.**" *Rizzo v. Goode,* 423 U.S. 362, 371, 96 S.Ct. 598, 604, 46 L.Ed.2d 561 (italics in original, boldface ours). This statement clearly demonstrates that the Supreme Court contemplated imposing liability in cases where supervisors did not directly commit the constitutional violation, but where an affirmative link existed between the constitutional violation and the supervisor's authorization or approval of that constitutional violation. *See also Andrews v. City of Philadelphia,* 895 F.2d 1469, 1478 (3rd Cir.1990) (adopting similar interpretation of *Rizzo* ). Also, in 1980, although in the context of racial discrimination, the First Circuit discussed the standard for imposing supervisory liability when a plaintiff was reasonably placed in fear for his personal safety as a result of the racially motivated misconduct of his fellow employees. The Court suggested that if, after the employer *was aware or should have been aware of the misconduct* and plaintiff's fear, and it failed to take "reasonably feasible measures to deal with the situation," the plaintiff could prevail on the theory that the employer violated Title VII by discharging him for reasons stemming from the offensive conduct of his fellow employees. *DeGrace v. Rumsfeld,* 614 F.2d 796, 804 (1st Cir.1980). Thus, defendants' argument that the imposition of supervisory liability in this case would in effect, "infuse on state officials strict liability" is without merit as the law had clearly established that a supervisor's conduct which was causally connected to a subor-

---

**14.** Defendants' additional claim that this particular factual situation, in which defendants were not sued as employers but rather as school officials/supervisors of a training program for prospective surgeons, was not one to which it was "clearly established" that the equal protection clause applied, is without merit. In a Supreme Court case which defendants had previously cited in one of their motions for qualified immunity, *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) the Court enunciated a standard, which was subsequently changed by later cases, for granting qualified immunity in the context of alleged constitution-

al violations committed by school officials, thus establishing that in certain circumstances, school officials as well as employers could be held liable for constitutional violations.

**15.** We agree with the plaintiff in that the reference to "clearly established" law in the qualified immunity inquiry refers to the plaintiff's right which was allegedly violated by the public official, not the standard of liability to be imposed. However, we address defendants' argument assuming *arguendo* that the qualified immunity inquiry can include this consideration.

dinate's violation of a plaintiff's constitutional right could result in supervisory liability.

## D. New Trial or Remittitur

Defendants have also filed a motion requesting a new trial, or in the alternative, a remittitur, based on the contention that the verdict is not supported by the weight of the evidence and that the testimony of plaintiff's expert witness, Dr. Jaime Santiago, was inadmissible and its admission is accountable for a substantial portion, if not all, of the damages awarded by the jury.

As previously discussed in section B above, Rule 59 states that the court may grant a new trial to all or any of the parties and on all or part of the issues "in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States...." Any error of law, if prejudicial, is grounds for granting a new trial. 11 Wright & Miller § 2805 at 38. Also, in determining whether a Rule 59 New Trial is warranted, the court must apply Rule 61 of the Federal Rules, which provides that no error or defect in any ruling or order by the court or in any action taken by the parties is ground for granting a new trial or setting aside a verdict unless "refusal to take such action appears to the court inconsistent with substantial justice." Therefore, only those errors that have resulted in substantial harm to the losing party justify a new trial; errors which are not prejudicial do not entitle a party to relief under Rule 59. 11 Wright & Miller § 2805 at 41.

■ After careful consideration of defendants' argument, we conclude that the admission of Dr. Santiago's testimony, even if improper, was not prejudicial and does not justify the granting of a new trial in light of the nature of compensatory damages in section 1983 cases, and the fact that there was sufficient evidence upon which the jury could have determined what the plaintiff would have earned had she not been discharged from the Program.

■ The Supreme Court has repeatedly noted that section 1983 has created a "spe-cies of tort liability" for violations of constitutional rights. *Carey v. Piphus,* 435 U.S. 247, 253, 98 S.Ct. 1042, 1047, 55 L.Ed.2d 252 (1978) (quoting *Imbler v. Pachtman,* 424 U.S. 409, 417, 96 S.Ct. 984, 989, 47 L.Ed.2d 128 (1976)). *See also Smith v. Wade,* 461 U.S. 30, 34, 103 S.Ct. 1625, 1629, 75 L.Ed.2d 632 (1983). Consequently, section 1983 damages for constitutional violations are usually determined according to principles derived from the common law of torts. *Memphis Community School District v. Stachura,* 477 U.S. 299, 306, 106 S.Ct. 2537, 2542–43, 91 L.Ed.2d 249 (1986) (citations omitted). *See also Santiago–Negrón v. Castro Dávila,* 865 F.2d 431, 440 (1st Cir.1989). Under this law, such damages are intended to provide compensation for the injury caused by the defendant's breach of duty, and may include not only out-of-pocket losses, but other injuries such as impairment of reputation, personal humiliation, and mental anguish and suffering. *Id.* (citations omitted). Thus, mental and emotional distress constitute compensable injury in section 1983 cases. *Carey,* 435 U.S. at 264, 98 S.Ct. at 1052.

■ In tort cases, when damages are given to compensate for losses not susceptible to precise calculation, the court will not second guess the jury's verdict unless it is "grossly excessive" or "shocking to the conscience," *Kolb v. Goldring, Inc.,* 694 F.2d 869, 871 (1st Cir.1982), or so high that "it would be a denial of justice to permit it to stand." *Segal v. Gilbert Color Systems, Inc.,* 746 F.2d 78, 80–81 (1st Cir. 1984). *See also Gutiérrez–Rodriguez v. Cartagena,* 882 F.2d 553, 577–78 (1st Cir. 1989). Based on this standard, we cannot conclude that the jury's verdict in this case was so excessive as to grant a new trial or to warrant a remittitur.

The plaintiff testified that after she was terminated from the Program as of July 1, 1983, she took the third portion of the State Medical Board in order to obtain a license and seek a job. After taking the exam in October of 1983, the plaintiff passed and began practicing general medicine in Guay-

nabo at the "Centro de Salud." Tr. 165. She started out earning approximately $1,000 a month, then $1,300 a month, and she worked there until "sometime in '86," doing general surgery, "helping out the people in the operating room ... read[ing] about the case and ... prepar[ing] the patient the day before...." Tr. 166. While working in Guaynabo, plaintiff did not have authority over major operations. After 1986, she started working for the San Juan Municipal Government at the "Dispensario Parada Diecinueve," as a general practitioner, where she examines patients, diagnoses their diseases and treats them. Tr. 166–67. She does not perform any operations in this position, and her starting salary was $1,500 and has gone up to $1,950 a month. At the time of trial, plaintiff was still working in this position. Tr. 167. Plaintiff also testified that as a result of the discriminatory treatment she experienced in the program, she had been humiliated and had suffered even further when she was dismissed from the program.[16]

During trial, several of the doctors who were residents ahead of plaintiff in the Surgery Program presented testimony related to their annual salaries:

1) Dr. Novoa, who works at the Cleveland Clinic, testified that after two years, he was earning $120,000.00, and stated that he could make five to eight times more in private practice.

2) Dr. Morales Otero, testified that he earns approximately $84,000.00 per year.

3) Dr. Orlando Torres Cartagena stated that he earns about $80,000.00 per year.

4) Dr. Orlando Cuevas stated that he earns approximately $150,000.00 per year in gross income.

In its instructions to the jury, the Court charged that as a result of the unlawful sex discrimination, plaintiff could be entitled to damages consisting of the income she would have received if she had continued in the Surgery Training Program less her income as a general medical practitioner, as well as compensation for her mental suffering. The verdict form did not distinguish between these two categories within the classification of compensatory damages under section 1983, and both of them are permissible elements of compensatory damages in a section 1983 case. *Stachura,* 477 U.S. at 307, 106 S.Ct. at 2543; *cf. Santiago–Negrón,* 865 F.2d at 437 (if issues of liability and compensatory damages determined by jury, "back pay" shall also be considered as item of compensatory damage). Because we find sufficient evidence upon which the jury could have calculated what the plaintiff would have earned as a surgeon (less her actual earnings) and because plaintiff presented sufficient evidence related to the mental anguish she experienced as a result of the discrimination she suffered, we conclude that the jury's verdict is not "so high that it would be a denial of justice" to permit it to stand. *Segal,* 746 F.2d at 80–81.

### E. Equitable Relief

Plaintiff has filed a motion requesting the court to reinstate her into the UPR Surgery Training Program. For the reasons stated below, we deny this request.[17]

---

**16.** Although defendants insist that plaintiff failed to mitigate her damages, plaintiff did work as a general physician, so that the amount she earned would be appropriately subtracted in calculating damages. Moreover, defendants mistakenly claim that Dr. Lipsett's failure to attend another surgery program, entering as a fourth year resident, precludes her from recovering damages. Several witnesses at trial, including Dr. Gonzalez, testified that it would be extremely difficult for the plaintiff to be admitted to another program after her third year, in light of the pyramidical structure of these types of programs.

**17.** We note that although the University of Puerto Rico and the defendants in their official ca-

pacities cannot be sued for damages as "persons" under section 1983, the defendants, or in this case, their successors, can be sued in their official capacities for prospective relief. *See González Castro v. Commonwealth of Puerto Rico,* DCO 90–032 at 87–88 (D.P.R.1990) (citing, *inter alia, Will v. Michigan Department of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 3106 n. 14, 87 L.Ed.2d 114 (1985)). Prior to trial, the Court dismissed the section 1983 damages claims against the University and the defendants in their official capacities. *See* Dockets # 260, 261.

The First Circuit, in carefully reviewing the positions of its sister circuits, has decided that the "presumption" of reinstatement expressed by some courts in section 1983 actions is not a substantive rule of law, but merely an attempt to reformulate the basic principle that, in determining appropriate relief on the chancery side, courts should weigh and balance the equities. *Rosario–Torres v. Hernández–Colón*, 889 F.2d 314, 323 (1st Cir.1989). In reaching this conclusion, the Court noted that section 1983 remedies, as discussed in section D above, are broad in scope and include compensatory and exemplary damages, unlike the remedies available in Title VII cases, including reinstatement, which are more narrowly circumscribed by the terms and purposes of the statute itself. *Id.* at 321–22. Furthermore, although reinstatement is an available remedy, it is not inevitable, and remains within the discretion of the trial court. *Id.* at 321.

After "weighing and balancing" the equities in this case, we conclude that reinstatement is not an appropriate remedy in this case for several reasons. First, certain "special considerations" over and above the "incidental" burdens reinstatement imposes exist in this case. *Rosario–Torres*, 889 F.2d at 324. Because of this particular setting, in which the surgery residents work as surgeons in positions which daily involve the health and lives of patients, and the particular hostility between the parties in this case, we think that the tense relationship which would exist between the plaintiff and the defendants' successors and the Surgery Program could lead to a "potentially explosive situation" in a context where people's "lives are at stake on a daily basis." *Ross v. Beaumont Hospital*, 678 F.Supp. 680, 682 (E.D.Mich. 1988). We note that in the usual case, this reason is generally not sufficient to deny equitable relief; however, in this specific factual situation, one in which the plaintiff would necessarily be working on an extremely intimate basis with fellow residents and the defendants' successors in a

setting in which people's lives are at stake every day, the existence of pervasive hostility or tension should be avoided. Moreover, we believe that the plaintiff's damages have been adequately redressed by the substantial compensatory damages which the jury has already awarded, and the attorney's fees and costs will be awarded. *Rosario–Torres*, 889 F.2d at 324.[18]

### F. Attorney's Fees for Federal Defendant

Finally, defendant Ernesto Rivé Mora, whom the jury found not liable, seeks attorney's fees, claiming that plaintiff filed and prosecuted this case against him in bad faith, with full knowledge of the "falseness of her allegations throughout the seven years of litigation." We deny this request.

In the context of Title VII, the Supreme Court has declared that a district court may, in its discretion, "award attorney's fees to a prevailing defendant ... upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." *Christiansburg Garment Co. v. Equal Employment Opportunity Commission*, 434 U.S. 412, 421, 98 S.Ct. 694, 700, 54 L.Ed.2d 648 (1978). In explaining the application of this criteria, the Court cautioned district courts to "resist the temptation" to engage in post hoc rationalizations by determining that because a plaintiff did not ultimately prevail at trial, the action was therefore unreasonable or baseless. *Id.* 434 U.S. at 421–22, 98 S.Ct. at 700.

Following the Supreme Court's guidance on this matter, we find that Dr. Lipsett's claim against Dr. Ernesto Rivé Mora was not "frivolous, unreasonable, or without foundation" and that the defendant is therefore not entitled to attorney's fees in this case. As the Circuit Court noted, although the question of plaintiff's *quid pro quo* claim was "close," the plaintiff raised

---

**18.** Plaintiff has also requested equitable relief directly from the UPR pursuant to Title IX, 20 U.S.C. § 1681 et seq. Because of the equitable considerations mentioned above, we deny this request.

a "factual issue to be resolved by the trier of fact." *Lipsett*, 864 F.2d at 914. Based on this conclusion, we certainly cannot classify plaintiff's action against Dr. Rivé Mora as "frivolous, unreasonable, or without foundation."

## III. CONCLUSION

Wherefore, in view of the foregoing, defendants' Motions for Judgment Notwithstanding the Verdict and requesting a new trial, or in the alternative, a remittitur are DENIED. Plaintiff's request for equitable relief is also DENIED. Finally, the federal defendant's motion seeking attorney's fees is DENIED, and his request for costs pursuant to Rule 54(d) of the Federal Rules of Civil Procedure and 28 U.S.C. § 1920, is GRANTED.

The Verdict of the Jury stands as originally entered. Plaintiff's Application for Attorney's Fees shall be submitted within forty-five days after entry of this Opinion and Order, and Defendant's Objections to Plaintiff's Verified Bill of Costs shall be submitted twenty days after entry of this Opinion and Order, pursuant to previous Orders of this Court.

IT IS SO ORDERED.